CONNECTION DISTRIBUTING
CO., Plaintiff–Appellant,

v.

The Honorable Janet RENO,
Defendant–Appellee.

No. 97–3092.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 6, 1998.

Decided Aug. 13, 1998.

Rehearing and Suggestion for Rehearing
En Banc Denied Oct. 22, 1998.

J. Michael Murray (argued and briefed), Lorraine R. Baumgardner (briefed), Berkman, Gordon, Murray, Palda & DeVan, Cleveland, OH, for Plaintiff–Appellant.

Jacob M. Lewis (briefed), Anne M. Lobell (argued and briefed), U.S. Department of Justice, Civil Division, Appellate Staff, Washington, DC, for Defendant–Appellee.

Before: NORRIS and CLAY, Circuit Judges; BORMAN, District Judge.[*]

CLAY, Circuit Judge.

Plaintiff–Appellant Connection Distributing Company appeals the denial of its motion for preliminary injunction against the enforcement of 18 U.S.C. § 2257 and 28 C.F.R. § 75, *et seq.*, on the ground that the statute and its implementing regulations violate the First Amendment as applied to Appellant. For the reasons set forth below, we **AFFIRM** the district court's denial of the preliminary injunction.

## I. BACKGROUND

### A. Nature of the Case

Plaintiff–Appellant Connection Distributing Company ("Connection") filed this action on September 13, 1995, seeking a judgment declaring 18 U.S.C. § 2257 (1994) and 28 C.F.R. § 75 (1997), *et seq.*, unconstitutional as applied to Connection and its readers and seeking injunctive relief against the Honorable Janet Reno in her official capacity as Attorney General of the United States.

---

[*] The Honorable Paul D. Borman, United States District Judge for the Eastern District of Michigan, sitting by designation.

Connection publishes and distributes approximately a dozen so-called "swingers" magazines. Connection defines the philosophy of "swinging" as: "an alternative social and sexual lifestyle comprised mostly of mature adults who believe in sexual freedom and do not believe in sexual monogamy." (J.A. at 44.) Connection's magazines contain, in addition to editorials and feature stories, messages placed by persons whose beliefs and philosophies embrace the "swinging" lifestyle. These individuals and couples place and respond to messages in Connection's various magazines. The messages often contain detailed descriptions of the subscribers' bodies and sexual tastes and frequently are accompanied by sexually explicit photographs of the subscribers. Some messages include photographs with persons simply nude or in street clothes, but many feature individuals or couples engaged in sexually explicit conduct. Although some of the magazines allow the subscriber to place his or her address directly beneath the message, the majority of the people submitting messages identify themselves through a code that appears at the beginning of the text of each message. Readers respond by writing to Connection, which charges a fee to forward the response to the message placer.[1] Connection also offers 900 number voice mailboxes for individuals who wish to respond by telephone, as well as an Internet service.

Connection asserts that the labeling and record-keeping provisions of 18 U.S.C. § 2257 and its accompanying regulations violate the First Amendment by unconstitutionally suppressing the free speech rights of Connection and its subscribers, by serving as an unlawful prior restraint, and by violating the free association rights of Connection's subscribers. The challenged record-keeping and labeling provisions require anyone appearing in a sexually explicit visual depiction to produce photographic identification and require anyone publishing such a visual depiction to maintain identification records and label the publication as to the location of those records. See 18 U.S.C. § 2257 and 28 C.F.R. § 75 et seq. Connection contends that, because anonymity is important to "swingers," these provisions stand as a barrier to those who wish to exercise their free speech rights to place messages and their free association rights to communicate with other "swingers" in Connection's magazines. Likewise, Connection asserts that its right to publish constitutionally protected expression is diminished because of the effect of the provisions on its subscribers and on Connection itself.

## B. Legal Framework

Following challenges to the constitutionality of the Child Protection and Obscenity Enforcement Act of 1988, Pub.L. No. 100–690, 102 Stat. 4485, Congress amended the statute through the passage of the Child Protection Restoration and Penalties Enhancement Act of 1990, 18 U.S.C. § 2257 (1994) (the "Act" or "Section 2257").[2] Section 2257 is a record-keeping statute that requires all producers of matter containing visual depictions of "actual sexually explicit conduct" to create and maintain records of the names and date of birth of the performers portrayed in the depictions. 18 U.S.C. § 2257(a), (b) (1994). The Act requires that the records be maintained at the producer's business premises, or as elsewhere permitted by regulations, and that the records be made available "to the Attorney General for inspection at all reasonable times." 18 U.S.C. § 2257(c) (1994). In addition, the Act mandates that the producers affix to each copy of material covered by its provisions a statement detailing where the depicted person's age verification records may be located. 18 U.S.C. § 2257(e)(1) (1994).

As defined by the Act, the term "produces" means to "produce, manufacture, or publish," and includes "duplication, reproduction, or

---

1. The terms "subscribers," "advertisers," and "readers" will be used interchangeably to describe those who place messages in Connection's magazines.

2. Congress amended the record-keeping provisions of the 1988 version of the statute during the

pendency of an appeal to the District of Columbia Circuit of a case challenging these provisions brought by a group of librarians and book, magazine, and video publishers, editors, and distributors. See *American Library Ass'n v. Barr*, 956 F.2d 1178, 1181 (D.C.Cir.1992).

reissuing," but does not include "mere distribution or any other activity which does not involve hiring, contracting for managing, or otherwise arranging for the participation of the performers depicted." 18 U.S.C. § 2257(h)(3) (1994). A "performer" is defined as "any person portrayed in a visual depiction engaging in, or assisting another person to engage in, actual sexually explicit conduct." 18 U.S.C. § 2257(h)(4)(1994). The Act applies only to depictions of "actual sexually explicit conduct," which is defined as: (1) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal sex; (2) bestiality; (3) masturbation; and (4) sadistic or masochistic abuse. *See* 18 U.S.C. § 2257(h)(1) (1994) (incorporating definitions of § 2256(2)(A)-(D)).

The Act also provides that no information or evidence obtained from the records shall be used "directly or indirectly" as evidence against any person with respect to any violation of law except for the record-keeping provisions themselves. 18 U.S.C. § 2257(d) (1994). Persons violating the Act are subject to fines and imprisonment of up to two years for the first offense, and up to five years (but not less than two) for succeeding convictions. 18 U.S.C. § 2257(i) (1994).

The regulations propounded by the Attorney General as required by 18 U.S.C. § 2257(b)(3) further define the Act's requirements. The regulations divide producers into two categories, "primary" and "secondary." 28 C.F.R. § 75.1(c) (1997). A primary producer is one who "actually films, videotapes, or photographs a visual depiction of actual sexually explicit conduct," *id.* § 75.1(c)(1), while a secondary producer "produces, assembles, manufactures, publishes, duplicates, reproduces, or reissues" materials containing such depictions that are "intended for commercial distribution." *Id.* § 75.1(c)(2).

The regulations require that all producers maintain records that contain "[t]he legal name and date of birth of each performer, obtained by the producer's examination of an identification document." *Id.* § 75.2(a)(1). Those records must include a "legible copy of the identification document examined," *id.*, as well as "[a]ny name, other than each performer's legal name, ever used by the performer, including the performer's maiden name, alias, nickname, stage name, or professional name." *Id.* § 75.1(c)(3). A secondary producer is permitted to "maintain records by accepting from the primary producer . . . copies of the records" as long as the secondary producer keeps the "name and address of the primary producer." *Id.* § 75.2(b).[3]

## C. Prior Proceeding

In its Complaint of September 13, 1995, Connection sought a declaratory judgment that the Act and its implementing regulations were unconstitutional under the First Amendment, as well as a temporary restraining order[4] and a preliminary and permanent injunction against the enforcement of the Act against Connection.

On April 8 and 9, 1996, the district court convened an evidentiary hearing on Connection's motion for preliminary injunction. At the hearing, Connection presented the testimony of Patricia Prementine, the editor for the past twelve years of the magazines published by Connection. Prementine testified that people who believe in the philosophy known as "swinging" are engaged in an alternative social and sexual lifestyle and "believe in sexual freedom and do not believe in sexual monogamy." (J.A. at 44.) Prementine testified that most "swingers" are married or couples, have been together for a number of years, and are thirty to fifty years old. (J.A. at 49.)

3. In *Sundance Associates, Inc. v. Reno,* 139 F.3d 804, 806–08 (10th Cir.1998), the Tenth Circuit struck down part of 28 C.F.R. § 75.1(c)(4)(iii) to the extent it requires record-keeping by producers who do not hire, manage, or arrange for the participation of the persons depicted. The court concluded that the regulations were impermissible because they were broader in scope than authorized by the Act. *Id.* We need not reach this issue in the instant case, however, because both parties acknowledge that Connection has made no such contention in this suit.

4. On October 24, 1995, the district court denied Connection's request, filed by separate motion, for a temporary restraining order against the enforcement of the Act. (J.A. at 32.)

Prementine estimated that approximately eighty-five to ninety percent of the persons who place ads in Connection's magazines request that their faces be blocked out. (J.A. at 71.) According to Prementine, and based on her personal experiences and contacts with "swingers," privacy and confidentiality are fundamental to the "swinging" lifestyle because the participants fear that their employers, communities, and families will reject them upon learning of their controversial lifestyle. (J.A. at 50–51.) Prementine asserted that, because of these privacy concerns, Connection's publications serve a critical and unique role to those choosing this alternative lifestyle by presenting information about social activities and functions and allowing a means for connecting with others who share their beliefs. (J.A. at 52–53.) Connection also presented the testimony of Robert McGinley as an "expert" on the "swinging" lifestyle.[5] McGinley likewise testified that privacy and confidentiality are very important to "swingers." (J.A. at 179–80.)

Prementine stated that prior to the passage of the Act, Connection required anyone wishing to place a message in its magazines to sign a release form assuring Connection that he or she was at least twenty-one years of age. (J.A. at 57.) Prementine personally reviewed all the submissions and, if a question arose regarding an individual's age or name, the submission would be returned and necessary verification required. (J.A. at 58–59.) Prementine further testified that when Connection began to make efforts in January 1995 to notify its readers of the new disclosure requirements imposed by the Act and send out its revised advertisement forms, the reader response was low, and there was a significant decline in the number of submissions Connection was receiving. (J.A. at 66–68.) Based solely upon her personal experience and her position as Connection's editor, Prementine opined that the decline in mes-

sages was attributable to the passage of the Act. (J.A. at 68.)

The government presented the testimony of Dr. Francis Michael Anthony Biro, the Director of Clinical Affairs in the Division of Adolescent Medicine at Children's Hospital Medical Center in Cincinnati, Ohio. Dr. Biro reviewed several issues of Connection's magazines to attempt to find photographs depicting minors by using a rating system of various stages of pubertal development used in adolescent medicine. (J.A. at 124–25.) Dr. Biro testified that the vast majority of the photographs he examined depicted persons in their thirties, forties, and fifties and did not require photographic identification to establish that they were older than the age of majority. (J.A. at 155.) Although Dr. Biro did identify three photographs that he believed depicted persons under the age of eighteen, this testimony conflicted with his earlier deposition testimony, in which he stated that none of the photographs he examined depicted minors. (J.A. at 127, 156–57.)

On January 16, 1997, approximately nine months after the date of the hearing, the district court denied Connection's motion for preliminary injunction. Although the district court's ruling primarily relied on its finding that Connection had not demonstrated a substantial likelihood of success on the merits, the court also found that the other factors for analyzing a request for a preliminary injunction did not weigh in favor of granting one. (J.A. at 27–30.)

Nonetheless, the district court granted Connection's motion for an injunction pending this appeal of the denial of the preliminary injunction. The district court concluded that, even though there was not a strong likelihood of success on the merits of the appeal, a stay of its order denying the preliminary injunction was warranted both because of the substantial legal questions involved in the case and because Connection would be irreparably harmed, in the form of its potential demise, if it were forced to

---

**5.** McGinley has a doctorate in counseling psychology and has co-authored a book on "swinging," written numerous articles, appeared on television and radio programs, operated businesses that have sponsored conventions, social events, tours and directories to assist those inter-

ested in learning about or engaging in the "swinging" lifestyle, conducted surveys and studies of "swingers," and had personal contact with thousands of "swingers" over the past twenty years. (J.A. at 171–76.)

comply with the statute during the pendency of the appeal. (J.A. at 37–38.) Accordingly, the district court issued an injunction barring the enforcement of the Act against Connection prior to the resolution of this appeal.

## II. STANDARD OF REVIEW

■ In determining whether or not to grant a preliminary injunction, a district court considers four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff could suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. *Golden v. Kelsey–Hayes Co.,* 73 F.3d 648, 653 (6th Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 49, 136 L.Ed.2d 13 (1996). "None of these factors, standing alone, is a prerequisite to relief; rather, the court should balance them." *Id.* (citations omitted).

■ An appeals court reviews a challenge to a district court's ruling on a preliminary injunction for abuse of discretion. *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross and Blue Shield Ass'n,* 110 F.3d 318, 322 (6th Cir.1997). "The district court's determination will be disturbed only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Id.*

■ When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor. With regard to the factor of irreparable injury, for example, it is well-settled that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality); *see also Newsom v. Norris,* 888 F.2d 371, 378 (6th Cir.1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.") (citing *Elrod* ). Thus, to the extent that Connection can es-

tablish a substantial likelihood of success on the merits of its First Amendment claim, it also has established the possibility of irreparable harm as a result of the deprivation of the claimed free speech rights. *See Dayton Area Visually Impaired Persons, Inc. v. Fisher,* 70 F.3d 1474, 1490 (6th Cir.1995).

■ Likewise, the determination of where the public interest lies also is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir.1994); *see also Dayton Area,* 70 F.3d at 1490 ("the public as a whole has a significant interest in . . . protection of First Amendment liberties"). Furthermore, although the government presumably would be substantially harmed if enforcement of a *constitutional* law aimed at fighting child pornography were enjoined, this determination, too, first requires a review of the merits of the claim.

Accordingly, because the questions of harm to the parties and the public interest generally cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation, the crucial inquiry often is, and will be in this case, whether the statute at issue is likely to be found constitutional. *Cf. Congregation Lubavitch v. City of Cincinnati,* 923 F.2d 458, 460 (6th Cir.1991) (noting, in its review of injunction requiring placement of menorah in public square, that because harm could be suffered by either party, and the public interest lies in the correct application of First Amendment principles, "our decision must turn on the likelihood of success on the merits").

## III. CONSTITUTIONALITY OF SECTION 2257 AS APPLIED TO CONNECTION AND ITS READERS

### A. Suppression of Free Speech

■ As a publisher of magazines containing sexually explicit visual depictions, Connection asserts that its First Amendment rights to publish and distribute constitution-

ally protected expression, as well as the rights of its advertisers to communicate with each other,[6] have been unconstitutionally suppressed as a result of the record-keeping and disclosure provisions of the Act. The protected nature of the expression involved in this case was not challenged before the district court and thus is not at issue. There is the possibility that the sexually explicit photographs published by Connection could be found constitutional because it is well-settled that "[s]exual expression which is indecent but not obscene is protected by the First Amendment," and hence subject to constitutional strictures.[7] *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989). Furthermore, the Supreme Court specifically has held that "non-obscene, sexually explicit materials involving persons over the age of 17 are protected by the First Amendment." *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 72, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994). Therefore, the photographs published by Connection are protected expression to the extent they feature adults engaged in non-obscene, sexually explicit conduct.[8]

■ Photographs featuring children engaged in sexually explicit conduct, however, would not constitute protected expression. In *New York v. Ferber*, 458 U.S. 747, 764, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), the Supreme Court held that, as long as the activity to be prohibited is adequately defined and limited by applicable state law, child pornography—defined generally as works that visually depict sexual conduct by children below a specified age—is not entitled to First Amendment protection. In upholding a statute prohibiting the distribution of child pornography, the Court in *Ferber* noted that States are entitled to greater leeway in the regulation of child pornography because of the State's interest in preventing the sexual exploitation of children and in closing down the distribution network that generates the market for child pornography, which in turn leads to the abuse of children involved in the production of the materials. *Id.* at 757–59, 102 S.Ct. 3348. The Court also has upheld a State's right to prohibit even the possession of child pornography. *See Osborne v. Ohio*, 495 U.S. 103, 111, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) ("[g]iven the gravity of the State's interests ... we find that Ohio may constitutionally proscribe the possession and viewing of child pornography").

6. Connection brings this action on behalf of itself and its advertisers. A litigant may raise a claim on behalf of a third party if the litigant can demonstrate that it has suffered a concrete, redressable injury, that it has a close relation with the third party, and that there exists some hindrance to the third party's ability to protect his or her own interests. *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 629, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). For the reasons explained in Part III.C, we conclude that Connection may properly assert the free speech and free association rights of its readers. *See* discussion *infra* Part III.C.

7. The standard for determining whether materials are obscene remains the same today as that set forth by the Supreme Court in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973):

"(a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id.*, 413

U.S. at 24, 93 S.Ct. at 2615 (internal quotation marks and citations omitted).
*Reno v. American Civil Liberties Union*, —— U.S. ——, 117 S.Ct. 2329, 2345, 138 L.Ed.2d 874 (1997). Based upon the record and factual scenario before us, we need not decide, and have not decided, specifically whether any of the materials at issue are obscene. However, we will assume, but solely for the purpose of analyzing the record-keeping provisions at issue, that the materials are not obscene.

8. This does not mean that use or distribution of these materials would be protected in all contexts. The government presumably could, for example, prohibit the distribution of these materials, even though not obscene, to minors. *See Ginsberg v. New York*, 390 U.S. 629, 636–37, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). Additionally, the First Amendment also would not protect the right to engage in the depicted sexual conduct publicly under the theory that the sexual act itself constitutes protected expression. *See Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 67, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). What is relevant for purposes of this case, however, is that the materials published by Connection are protected expression in the context of the record-keeping provisions at issue.

The goal of preventing the sexual exploitation of children undoubtedly is a compelling and important one, which the government not only is permitted but perhaps obliged to pursue. *See Ferber*, 458 U.S. at 757, 102 S.Ct. 3348 (finding prevention of the sexual exploitation and abuse of children to be a government objective of "surpassing importance"). Recently, Congress has further attempted to fight child pornography through the passage of the Child Pornography Prevention Act of 1996, Pub.L. No. 104–208, 110 Stat. 3009–26 (codified at 18 U.S.C. § 2252A (Supp. II 1996)). This new statute, aimed at curbing the effects of computer technology upon the child pornography industry, broadens the scope of child pornography laws by making it illegal to possess or distribute, electronically or otherwise, child pornography and defining "child pornography" to include visual depictions, however generated or created, that feature minors, have been created or modified to appear to feature minors, or are marketed as featuring minors engaged in sexually explicit conduct. *See* 18 U.S.C. § 2252A (Supp. II 1996) (incorporating definition of "child pornography" contained in 18 U.S.C. § 2256(8)(Supp. II 1996)).[9]

▮ However, even in the pursuit of the most worthy of goals, the government may not unduly burden free speech. In determining whether the Act inappropriately hinders the exercise of the protected speech at issue, it is necessary first to determine whether the Act is content-based or content-neutral because that determination will decide the level of scrutiny.

The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even

if it has an incidental effect on some speakers or messages but not others. Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech.

*Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (citations and internal quotations omitted).

The stated purpose of the original Child Protection and Obscenity Enforcement Act of 1988, which § 2257 amended, was to alleviate the difficulty for law enforcement officers in ascertaining whether an individual in a film or other visual depiction is a minor for the purpose of combating child pornography. *See* 1 Attorney General's Commission on Pornography, *Final Report* 618–20 (July 1986) ("Final Report"). The Attorney General's Commission on Pornography reasoned that, because some pornographers deliberately use youthful-looking adult models, there needed to be a statute requiring producers of sexually explicit material to maintain records of age verification. *Id.* at 618. The Commission also concluded that minors deserve special protection from the risks inherent in the production of pornographic materials and, therefore, individuals should be prohibited from employing, using, persuading, inducing, or coercing any minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct. *Id.* at 618–19.

The government's goal of preventing child pornography through the record-keeping provisions of the Act clearly is not an attempt to regulate the speech of Connection and its advertisers because of disagreement with the messages they convey. Although the Act does require that the content of speech be examined to determine its applicability, the Act is not directed at the protected speech but rather unprotected conduct— namely, child pornography—that may be

---

9. Recently, this statute has been subjected to constitutional challenge, particularly on the basis that because the statute prohibits sexually explicit visual depictions of persons who only *appear* to be minors, it prohibits constitutionally protected expression. *See United States v. Hilton*, 999 F.Supp. 131, 134–37 (D.Me. 1998) (finding prohibition on pornography with child-like depictions

to be content-neutral but striking the definition of "child pornography" on the basis of vagueness); *Free Speech Coalition v. Reno*, No. C 97–0281VSC, 1997 WL 487758 at * 4, 6 (N.D.Cal. Aug. 12, 1997) (finding prohibition on child-like depictions content-neutral and sufficiently defined to withstand vagueness challenge).

identified by the speech. Therefore, the fact that publishers or producers of sexually explicit visual depictions are, to some extent, treated differently from other types of producers of visual depictions does not make the Act content-based. *Cf. City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47–48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (finding that zoning ordinance restricting the placement of adult theaters was aimed at the secondary effects of such theaters on the surrounding community and thus was a content-neutral regulation despite the differing treatment received by adult theater owners as compared to other theater owners); *see also R.A.V. v. City of St. Paul, Minn.,* 505 U.S. 377, 389, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (noting that a "valid basis for according differential treatment to even a content-defined subclass of proscribable speech is that the subclass happens to be associated with particular 'secondary effects' of the speech, so that the regulation is 'justified without reference to the content of the ... speech' ") (citations omitted). Thus, although the Act may not be content-neutral in a technical sense, because it is directed at curbing the secondary effects of the speech and not the speech itself, it is proper to deem it content-neutral for First Amendment purposes. *See Richland Bookmart, Inc. v. Nichols,* 137 F.3d 435, 440 (6th Cir.1998) (noting that regulations of sexually explicit speech which are aimed at its secondary effects are, in fact, content-based but merely are to be treated as content-neutral). The reason for this difference in treatment is that the Supreme Court has held that although sexually explicit expression is protected by the First Amendment, "society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude" than the societal interest in other forms of expression, such as political debate. *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 70, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality). Accordingly, because § 2257 is a regulation aimed at the secondary effects of sexually explicit speech, it is properly analyzed as a content-neutral regulation.

■ The intermediate level of scrutiny applies to content-neutral regulations that impose an incidental burden on speech. *Tur-* *ner Broadcasting Sys., Inc. v. FCC,* 512 U.S. 622, 662, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Under this standard, a government regulation is constitutional if the obligations it imposes are "narrowly tailored to serve a significant governmental interest, and ... leave open ample alternative channels for communication of the information." *Ward,* 491 U.S. at 791, 109 S.Ct. 2746 (citation and internal quotations omitted).

■ With regard to the requirement of narrow tailoring, Connection argues that the Act burdens substantially more speech than is necessary to achieve its professed goal of combating child pornography. Although Connection acknowledges that the protection of children is a legitimate and substantial government interest, it claims that the Act's record-keeping provisions unnecessarily diminish the First Amendment rights of adults because the Act's goal is not furthered by the record-keeping provisions as applied to Connection and its readers.

It is true that the interest of protecting children may not always justify limitations on the First Amendment rights of adults, and the government is not excused from the tailoring requirement merely because the interests of children are involved. In *Sable Communications of Cal., Inc. v. FCC,* 492 U.S. 115, 130–31, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), the Supreme Court struck down a total ban on indecent commercial telephone communications as not sufficiently justified by the government interest in preventing minors from being exposed to those messages. In balancing the interests at stake, the Court found that the statute's complete denial of adult access to telephone messages which are indecent but not obscene far exceeded that which was necessary to limit the access of minors to such messages. *Id.* at 131, 109 S.Ct. 2829. Similarly, in *Reno v. American Civil Liberties Union,* — U.S. ——, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), the Court invalidated provisions of an act designed to protect minors from harmful material on the Internet because the statute unnecessarily suppressed a broad amount of adult speech. *Id.* —— U.S. at ——, 117 S.Ct. at 2346–48. Therefore, courts must weigh

the interests at stake in determining whether a statute impermissibly burdens free speech.

It is alleged by Connection that the vast majority of its advertisers are well over the age of majority. Nonetheless, a universal requirement of age disclosure, regardless of the apparent age of an individual in a visual depiction, is critical to the government's interest in ensuring that no minors are depicted in actual sexual conduct. Although standards based on "obvious" maturity would lead to accurate determinations in many cases, they also would attach an ineffectual subjectivity to the age determination, which was the target of the Act in the first place. *See Final Report* at 620 ("By viewing a visual depiction, how does one decide if the performer is fourteen or eighteen, seventeen or twenty-one?").

■ Furthermore, to satisfy the narrow tailoring requirement of the intermediate scrutiny test, a regulation need not be the least speech-restrictive means of achieving the government's interests. *Turner Broadcasting*, 512 U.S. at 662, 114 S.Ct. 2445. All that is required for narrow tailoring is that the regulation does not burden substantially more speech than is necessary to further the government's legitimate interest. *Id.* If the government wishes to prevent the sexual exploitation of children through the production of child pornography, application of the record-keeping provisions to all producers of sexually explicit materials is necessary and not unduly burdensome.

In *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), the Supreme Court analyzed a zoning ordinance that prohibited adult motion pictures from locating within 1,000 feet of any residential zone. After noting that the ordinance did not ban adult theaters altogether, but merely put restrictions on their location, the Court upheld the ordinance under the intermediate scrutiny test. *Id.* at 52–54, 106 S.Ct. 925. The Court found that the ordinance represented a valid governmental response to the "admittedly serious problems" created by adult theaters and was not used as a "pretext for suppressing expression" but rather was an attempt to make some areas available for adult theaters

and their patrons, while at the same time preserving the quality of life in the community at large. *Id.* at 54, 106 S.Ct. 925 (citations omitted).

The Act, like the ordinance at issue in *City of Renton*, also is a reasonable attempt to balance the free speech interests of Connection and its readers against the interest of the government in fighting child pornography. Child pornography is an "admittedly serious" problem, and the record-keeping provisions of the Act clearly are not a "pretext for suppressing expression." *See City of Renton*, 475 U.S. at 54, 106 S.Ct. 925. The provisions are a reasonable attempt to prevent the use of minors in pornographic materials. By requiring that age verification records be submitted and maintained, the provisions do not prohibit the sexually explicit speech at issue or unduly burden the opportunity of Connection and its readers to engage in the expression. Because the Act supports the government's interest in fighting pornography, while allowing Connection and its readers to exercise their free speech rights, it satisfies the requirement of narrow tailoring. *See Turner Broadcasting*, 512 U.S. at 662, 114 S.Ct. 2445.

■ Similarly, the Act is not impermissibly overbroad. A statute is overbroad when it includes within its prohibitions activities that are constitutionally protected. *See Grayned v. City of Rockford*, 408 U.S. 104, 114, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Although the majority of Connection's readership may not be the object of the Act's focus, the allowance of exceptions to the disclosure requirements—presumably based on a subjective determination by Connection as to a subscriber's age—would not promote the Act's goal of eliminating the use of minors in pornography.

■ Connection also argues that the Act unconstitutionally chills protected speech. A statute may be stricken as unconstitutional under the First Amendment if it has a substantial chilling effect upon protected speech. *See, e.g., Reno*, ⎯ U.S. at ⎯, 117 S.Ct. at 2345 (explaining that the vagueness of the Communications Decency Act and the severity of its criminal sanctions "may

well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images"). Connection contends, based primarily on anecdotal evidence and supposition, that the potential of their identifying information being disclosed to the government will chill its advertisers from exercising their right to publish sexually explicit photographs and will result in the self-censorship of their speech.

The Supreme Court "consistently has refused to allow government to chill the exercise of constitutional rights by requiring disclosure of protected, but sometimes unpopular, activities." *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 767, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (striking down reporting requirements of Pennsylvania abortion law where records would be available to public), *overruled on other grounds by Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). In this case, however, the provisions at issue do not require the disclosure of any information about the subscribers to the public. The Act does not constitute an impermissible "chill" on the exercise of free speech rights because it clearly does not contemplate public release of the information or "raise the specter of public exposure and harassment" of "swingers" who choose to express themselves through Connection's publications. *Thornburgh,* 476 U.S. at 767, 106 S.Ct. 2169; *cf. Planned Parenthood of Central Mo. v. Danforth,* 428 U.S. 52, 79–81, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (upholding constitutionality of mandatory abortion records that were accessible only to public health officers).

■ All of the preceding relates to the requirement that a content-neutral regulation of speech be "narrowly tailored." This requirement is satisfied "'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward,* 491 U.S. at 799, 109 S.Ct. 2746 (1989) (quoting *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)). The Act complies with this requirement and

is neither overbroad nor an impermissible chill on free expression because, as explained above, the government's interest in eliminating child pornography would be less effectively promoted without the record-keeping and disclosure requirements.

■ Connection also argues that the Act does not comply with the part of the intermediate scrutiny test which requires that a regulation of protected expression leave open "ample alternative channels" for the communication. Related to this argument is the contention that the regulation interferes with the rights of Connection's readers to express themselves anonymously. Connection contends that a person wishing to publish a sexually explicit message without submitting identification documents that may be made available to the government no longer has a forum where he or she can publish that message anonymously.

Connection is correct that the Supreme Court has recognized that the right to communicate anonymously is encompassed within the First Amendment. In *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), the Court struck down an ordinance prohibiting the anonymous distribution of political leaflets. The Court noted that "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *Id.* at 342, 115 S.Ct. 1511. Nonetheless, Connection's and its readers' First Amendment rights have not been violated.

■ First, Connection has defined the relevant channel of communication too narrowly. Connection claims that what is destroyed by the Act is a channel for anonymous, sexually explicit visual expression that does not require the submission of identification documents. However, the requirement that ample alternative channels be left available does not mean that there must be a channel where Connection and its readers can express themselves in precisely the same manner as before the regulation. *Cf. Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559,

69 L.Ed.2d 298 (1981) (noting that "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired"). Indeed, if there were an identical channel available for the communication, there likely would be no constitutional challenge.

If the relevant channel instead is defined merely as a forum for anonymous, sexually explicit visual expression, alternative channels clearly remain available. People who wish to submit sexually explicit photographs to Connection's magazines still may do so. These persons also may have their photographs *published* anonymously. All that has been restricted is their ability to *submit* their photographs without identification but not their right to express themselves, via their advertisements, anonymously. In point of fact, Connection's subscribers already were required to identify themselves and verify their ages to the magazines' editor. All that has changed is that documentation of age is required, and this information must be made available to the government if requested. Public disclosure of this information is neither required nor suggested by the terms of the Act. This condition of entry to this forum for anonymous, sexually explicit speech does not destroy the forum. Even assuming *arguendo* that Connection's readers will be less likely to engage in this form of expression because of the fear of disclosure, this unsubstantiated fear, and not the Act, is what is diminishing the forum. *See Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 60, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989) ("mere assertion of some possible self-censorship resulting from a statute is not enough to render ... [a] law unconstitutional").

In addition, this fear of disclosure argument is weakened by the fact that Connection's readers already have placed themselves at risk of losing the anonymity of their speech by submitting sexually explicit photographs of themselves to be published and distributed in Connection's magazines. Even if the majority of Connection's advertisers do ask to have their faces blocked out of the advertisements and identify themselves only through the code at the beginning of each message, they still are subjecting themselves to potential disclosure because anyone may respond to the advertisement and then discover the advertisers' identities. Likewise, advertisers already have been disclosing their identities to Connection, which could also subject them to at least some risk of public disclosure.

Furthermore, defining the forum even more broadly indicates that there are numerous "reasonable alternative avenues of communication" available for sexually explicit expression. *See City of Renton*, 475 U.S. at 53, 106 S.Ct. 925 (finding zoning ordinance which prohibited adult motion pictures from locating near residential zones left ample land available for theaters in other areas). Undocumented sexually explicit expression is permitted if the acts of sexual conduct are simulated or do not otherwise fall within the proscriptions of the Act. Obviously, documentation also is not required for photographs of subscribers who are merely nude, fully clothed, or submit text-only messages. Connection's subscribers also may make use of its voice mailboxes for "swingers" and its service on the Internet. Therefore, subscribers who wish to engage in sexually explicit expression, without submitting documentation, still have alternative channels of communication available. Because the regulation at issue does not restrict the quantity or content of the expression, in the absence of any showing that the remaining channels of communication are inadequate, the requirement for alternative channels has been met. *See Ward*, 491 U.S. at 802, 109 S.Ct. 2746. Therefore, as applied in this case, the Act does not impermissibly burden Connection's or its subscribers' free speech rights.

## B. Prior Restraint

 Connection argues that the Act operates as a prior restraint because advertisers must comply with the record-keeping provisions before they can publish their expression. Typically, "[t]he term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550, 113

S.Ct. 2766, 125 L.Ed.2d 441 (1993) (citation and internal quotations omitted). Unlike this case, a prior restraint usually is alleged where a public official has been given discretionary power to deny use of a forum in advance of actual expression. *See Ward*, 491 U.S. at 795 n. 5, 109 S.Ct. 2746 (noting that most prior restraint cases have public officials with the power of pre-approval in common). Connection and its subscribers are not being forbidden from engaging in expressive activity in the future, but rather they potentially are being subjected to sanctions *following* their expressive activity—but only if they subsequently are found guilty of violating the record-keeping provisions. Because there is a "well-established distinction between prior restraints and subsequent criminal punishments," *Alexander*, 509 U.S. at 548, 113 S.Ct. 2766, the Act does not constitute a prior restraint. In addition, for the reasons discussed above, the Act does not constitute a prior restraint because of any alleged self-censorship or "chilling effect" that it may have on Connection's readers.

## C. Freedom of Association

Connection argues that the Act violates the free association rights of its members by inhibiting their right to publish sexually explicit messages seeking to associate with others of like beliefs without coming forward and identifying themselves.

 The first issue to address is whether Connection has *jus tertii*, or right of a third party, standing to assert this right of freedom of association on behalf of its readers. Although generally a party may not assert rights or interests of third parties, there are exceptions to this rule. *See Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 629, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). A litigant may raise a claim on behalf of a third party if the litigant can demonstrate that it has suffered a concrete, redressable injury, that it has a close relation with the third party, and that there exists some hindrance to the third party's ability to protect his or her own interests. *Id.* Because Connection's own free speech rights are implicated, and it is directly subject to the strictures of the Act, Connection may challenge the Act

on behalf of its readers, who are affected by the regulation of Connection's activities. *See Craig v. Boren*, 429 U.S. 190, 195, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) ("vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function"); *accord Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1394 (6th Cir. 1987).

 Furthermore, even if Connection were attempting solely to assert its readers' rights and not its own, *jus tertii* standing would be appropriate under the facts of this case. When determining whether a party may assert the constitutional rights of others, a court must consider: (1) whether the relationship of the litigant to the third party is such that the litigant is an effective proponent of the rights of the third party; and (2) whether the third party is hindered in its ability to assert its own rights. *Singleton v. Wulff*, 428 U.S. 106, 114–16, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Planned Parenthood Ass'n of Cincinnati, Inc.*, 822 F.2d at 1394. In the present case, Connection properly may assert the First Amendment rights of its readers to remain anonymous in their speech and to freely associate with one another. Because a right to anonymity is at issue, "[t]o require that [the right] be claimed by the [readers] themselves would result in nullification of the right at the very moment of its assertion." *NAACP v. Alabama*, 357 U.S. 449, 459, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (finding that NAACP could assert the right of its rank-and-file members not to be identified). Accordingly, Connection may assert the rights of its readers.

 Freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of freedom of speech. *NAACP*, 357 U.S. at 460, 78 S.Ct. 1163. This freedom may be threatened if there is forced disclosure of an individual's membership in an organization. In *NAACP v. Alabama*, the Supreme Court held that the NAACP could not be forced to disclose its membership lists to the State of Alabama because disclosure would adversely affect the ability of its mem-

bers to collectively advocate and associate due to the fear of reprisals resulting from this disclosure. *Id.* at 462–63, 78 S.Ct. 1163. The position of Connection's readership, however, is not analogous to that of the NAACP members. In NAACP, the Court noted the fact that the organization had made an uncontroverted showing that reprisals had occurred in the past when identity of the members had been disclosed. *Id.* at 462, 78 S.Ct. 1163. Although Connection presented testimony that "swingers" have suffered reprisals when their lifestyles have been discovered by their communities, there has been no evidence offered that they will suffer reprisals from this information being disclosed only to the government.

Perhaps more importantly, Connection's readers' freedom to associate by means of its magazines is not significantly hindered by the Act. The readers still may associate freely and anonymously by submitting numerous types of messages and pictures for publication without providing documentation of name or age. Clearly, the right of the readers to freely associate with like-minded persons is not infringed by the presence of a record-keeping provision that applies only to a highly specific form of expression and requires potential disclosure only to the government. Accordingly, the free association rights of Connection's readers have not been violated.

## IV. CONCLUSION

■ Accordingly, it is clear that Connection has not demonstrated a substantial likelihood of success on the merits of its claim that the Act and its implementing regulations violate the First Amendment rights of Connection and its readers.[10] In addition, the other factors relevant to the granting of a preliminary injunction weigh against Connection's motion. The public has a strong interest in the enforcement of a law designed to fight child pornography, and the granting of an injunction against the enforcement of a likely constitutional statute would harm the

government. Furthermore, Connection has not demonstrated that it will be irreparably injured absent the granting of an injunction. Accordingly, the district court did not abuse its discretion, and we hereby **AFFIRM** the district court's denial of the preliminary injunction and **VACATE** the stay pending appeal.

---

**10.** In analyzing the Act under a similar constitutional attack, the District of Columbia Circuit likewise has concluded that the aspect of the record-keeping provisions at issue in this case does not violate the First Amendment. *See American Library Ass'n v. Reno,* 33 F.3d 78 (D.C.Cir. 1994).