721 N.W.2d 233 (2006)
Kheireddin HAMADE, Plaintiff-Appellant, and
Nouhad Hamade, Plaintiff,
v.
SUNOCO, INC. (R & M), John G. Drosdick, Ann C. Mule, Paul A. Mulholland, Robert J. Darnall, Ursula F. Fairbairn, Thomas P. Gerrity, Rosemarie B. Greco, James G. Kaiser, Robert D. Kennedy, Richard H. Lenny, Norman S. Matthews, R. Anderson Pew, G. Jackson Ratcliffe, Larry Wilcox, J. McMahon, Jeff Byard, and Aretha Battle, Defendants-Appellees.
Docket No. 265226.
Court of Appeals of Michigan.
Submitted May 9, 2006, at Detroit.
Decided May 25, 2006, at 9:00 a.m.
Released for Publication August 28, 2006.
*238 Norman Yatooma & Associates, P.C. (by Norman A. Yatooma, Joseph N. Ejbeh, Howard Yale Lederman, and Ryan D. Bobel), Birmingham, and Muawad & Muawad, P.C. (by Elias Muawad), St. Clair Shores, for the plaintiff.
Fischer, Franklin & Ford (by Francis E. Bentley and Troy C. Otto), Detroit, for the defendants.
Before: SMOLENSKI, P.J., and OWENS and DONOFRIO, JJ.
SMOLENSKI, P.J.
In this dispute arising out of the breakdown in the business relationship between plaintiff, Kheireddin Hamade,[1] and defendant, Sunoco, Inc. (R & M) (Sunoco),[2] plaintiff appeals as of right the trial court's grant of summary disposition in favor of defendants. We affirm.

I. Facts and Procedural History
In 1986 Hamade purchased an existing gas station with the Sunoco brand from its owner with the approval of Sunoco. At that time, Hamade entered into a dealer supply franchise agreement with Sunoco, which lasted until 1989.[3] After the expiration of the first agreement in 1989, Hamade entered into a new dealer supply franchise agreement with Sunoco, which lasted until 1992 (the 1989 Agreement). From 1992 to 1997, Hamade continued operating his station as a Sunoco station by obtaining extensions of the 1989 Agreement.
In 1997 Hamade still had not obtained a new dealer supply franchise agreement with Sunoco. At his deposition, Hamade stated that Sunoco insisted that he make numerous improvements to his station before it would be interested in signing a new agreement. The improvements included enlarging and modernizing the station islands, installing larger fuel tanks, installing a canopy, and remodeling the service station store. In addition, Hamade claimed that Sunoco required him to significantly increase his motor fuel sales. After he completed the improvements and began to negotiate a new agreement with *239 Sunoco, Hamade stated that he asked Sunoco's representative, Jeff Byard, about placing a provision in the contract preventing Sunoco from approving another Sunoco station within a certain distance of his station on the same line of traffic. Hamade testified that Byard responded by saying that he did not need to worry about that because Sunoco would never do that. Hamade said that he took Byard at his word and entered into a new dealer supply franchise agreement (the 1997 Agreement).
In September 2000, Sunoco approved a new Sunoco station at a location that was approximately one mile from Hamade's station on the same road. At his deposition, Hamade stated that, in December 2000, he had problems with customers who experienced engine trouble after purchasing fuel from his station. Hamade claimed that the problems arose from a bad batch of fuel delivered by Sunoco. Hamade testified that his business suffered as a result of the opening of the new Sunoco station and the delivery of bad fuel.
On February 8, 2001, plaintiff filed suit. In the complaint, plaintiff alleged that Sunoco breached its agreement not to approve another Sunoco station within Hamade's exclusive territory, violated Michigan's Franchise Investment Law (MFIL),[4] converted Hamade's exclusive territory, and tortiously interfered with his business relations when it deliberately delivered defective fuel in an attempt to induce his customers to switch to the new Sunoco station. Plaintiff also alleged a claim based on promissory estoppel. On April 11, 2002, Sunoco moved for summary disposition. In orders dated July 17 and 29, 2002, the trial court granted summary disposition in favor of defendants on all of plaintiff's claims except the claims of breach of contract and tortious interference with a business relationship.
On July 3, 2003, plaintiff filed an amended complaint with 14 separate counts. Counts I through III were for various violations of the MFIL. Count IV restated plaintiff's original breach of contract claim. Count v. alleged a claim based on promissory estoppel. Count VI alleged a breach of Sunoco's duty to set an open price term in good faith under Michigan's Uniform Commercial Code (MUCC).[5] Count VII alleged a breach of the Michigan Antitrust Reform Act.[6] Count VIII alleged a claim for unjust enrichment. Count IX restated plaintiff's original claim for conversion. Count X restated plaintiff's original claim for tortious interference with a business relationship. Counts XI through XIII alleged claims based on fraud, and count XIV alleged a civil conspiracy claim. On October 15, 2003, defendants moved for summary disposition of plaintiff's first amended complaint. On May 25, 2004, the trial court granted defendants' motion with respect to counts VII, IX, X, XI, and XIV.
On July 25, 2005, defendants again moved for summary disposition of plaintiff's first amended complaint. The trial court held a hearing on this motion on August 15, 2005. At the hearing, the trial court granted defendants' motion for summary disposition of plaintiff's claims based on the MUCC and unjust enrichment. The trial court also granted defendants' motion for summary disposition of plaintiff's MFIL claims. The trial court reasoned that summary disposition of the MFIL claims was appropriate because plaintiff failed to show that Hamade paid a fee for the privilege of entering into business under a franchise agreement and, *240 therefore, the 1997 Agreement was not subject to the requirements imposed by the MFIL.
The trial court continued the hearing on defendants' motion for summary disposition on August 16, 2005. At the continuation of the hearing, the trial court determined that in light of the written agreement, Hamade's reliance on any representation made by Sunoco was not reasonable as a matter of law and, therefore, there could be no promissory estoppel claim. The trial court also noted that the agreement disclaimed any warranties on the part of Sunoco regarding present or future competitive activities. Because the agreement also contained an integration clause, the trial court concluded that the parol evidence rule barred plaintiff's attempts to present evidence to contradict the terms of the written agreement. Therefore, the trial court concluded that plaintiff's contract claim and claims based on fraud must also fail.
The trial court entered an order dismissing plaintiff's case in its entirety on August 26, 2005. This appeal followed.

II. The MFIL Claims
On appeal, plaintiff first argues that summary disposition of the MFIL claims was inappropriate because plaintiff presented sufficient evidence before the trial court to either establish that the 1997 Agreement constituted a "franchise" for purposes of the MFIL or to create a factual question on that issue.[7] We disagree.
This Court reviews de novo the trial court's decision to grant summary disposition. Moore v. Cregeur, 266 Mich.App. 515, 517, 702 N.W.2d 648 (2005). A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a claim. Dressel v. Ameribank, 468 Mich. 557, 561, 664 N.W.2d 151 (2003). Summary disposition is appropriate under MCR 2.116(C)(10) if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." When determining whether there is a genuine issue regarding any material fact, the trial court must consider the evidence presented by the parties in the light most favorable to the party opposing the motion. Smith v. Globe Life Ins. Co., 460 Mich. 446, 454-455, 597 N.W.2d 28 (1999). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." West v. Gen. Motors Corp., 469 Mich. 177, 183, 665 N.W.2d 468 (2003), citing Shallal v. Catholic Social Services of Wayne Co., 455 Mich. 604, 609, 566 N.W.2d 571 (1997), and Quinto v. Cross & Peters Co., 451 Mich. 358, 369, 547 N.W.2d 314 (1996). "Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law." Maiden v. Rozwood, 461 Mich. 109, 120, 597 N.W.2d 817 (1999).
This Court also reviews de novo the proper interpretation of a statute. Macomb Co. Prosecutor v. Murphy, 464 Mich. 149, 157, 627 N.W.2d 247 (2001). This Court begins the interpretation of a statute by examining the language of the statute itself. If the language is not ambiguous, the Court shall not construe it, but *241 will enforce it as written. Id. at 158, 627 N.W.2d 247.
Under MCL 445.1502(3), a "franchise" is defined as
a contract or agreement, either express or implied, whether oral or written, between 2 or more persons to which all of the following apply:
(a) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor.
(b) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate.
(c) The franchisee is required to pay, directly or indirectly, a franchise fee.
Defendants did not contest the existence of the first two requirements before the trial court and have not contested them on appeal. Instead, defendants argued and presented evidence that Hamade never paid a franchise fee and, therefore, the 1997 Agreement was not a franchise subject to the MFIL.
Pursuant to MCL 445.1502(3)(c), an agreement will not be considered a franchise within the meaning of the MFIL unless the "franchisee is required to pay, directly or indirectly, a franchise fee." At his deposition, Hamade admitted that he did not pay a direct franchise fee. However, plaintiff contends that Sunoco compelled him to indirectly pay a franchise fee when it (1) required him to purchase excess inventory and meet an increased monthly quota of fuel sales, (2) required him to make a $10,000 collateral deposit, (3) compelled him to make numerous improvements to his station, (4) conditioned the agreement on his ability to repay a cash loan, (5) compelled him to attend training seminars, (6) charged him a fee for equipment that it loaned to him, and (7) failed to pass on the reduction in price occasioned by a reduction in the federal excise tax.
Under MCL 445.1503(1), a "franchise fee" is defined as "a fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business under a franchise agreement, including but not limited to payments for goods and services." Hence, the primary inquiry is whether Hamade was required or agreed to pay a fee or charge to Sunoco for the "right to enter into a business under a franchise agreement...." Furthermore, although a franchise fee may include payments for goods and services, MCL 445.1503(1)(a) specifically states that the payment of a franchise fee does not include the "purchase or agreement to purchase goods, equipment, or fixtures directly or on consignment at a bona fide wholesale price."
We shall first address plaintiff's contention that Sunoco required him to indirectly pay a franchise fee by compelling him to purchase and sell an excessive monthly quota of fuel and to purchase excess inventory. Specifically, plaintiff alleged that Sunoco required him to sell 94,000 gallons of fuel a month as opposed to his previous quota of 40,000 gallons a month and that Sunoco "charges the franchisees for their signs to advertise their products and name of gas station, and charges excessive prices for toys and articles with Sunoco's name and emblem, which are items that are forced upon their franchisees to sell beyond a bona fide price."
Under Michigan law, minimum purchase or minimum inventory requirements *242 may constitute a "franchise fee" as that term is defined by MCL 445.1503(1). See 1999 AC, R 445.101(2)(e). However, a minimum purchase or minimum inventory requirement will not constitute a franchise fee under the MFIL if the price charged for the goods required to be purchased or held in inventory is "a bona fide wholesale price"[8] and there is "a well-established market in this state"[9] for those goods. Id. While not binding on this Court, the reasoning employed by the court in Digital Equipment Corp. v. Uniq Digital Technologies, Inc., 73 F.3d 756 (C.A.7, 1996) (interpreting Illinois franchise law) is instructive on the issue of indirect fees through inventory requirements. In Uniq, the court explained that
an obligation to carry a large inventory can be the economic equivalent of a franchise fee. An excessively large inventory transfers cash to the seller without producing benefits for the buyer; and the interest the seller earns by making the sales earlier is a kind of fee. Like a cash payment, it transfers wealth from buyer to seller (one can speak of a "transfer" because, by hypothesis, the buyer gets no benefit from the inventory). [Id. at 760.]
See also Wright-Moore Corp. v. Ricoh Corp., 908 F.2d 128, 136 (C.A.7, 1990) (noting that, under Indiana law, excess inventory requirements may constitute an indirect franchise fee if the inventory is illiquid, but a normal sales quota will not be a franchise fee under the bona fide wholesale price exception). The requirements of Rule 445.101(2)(e) are consistent with the reasoning stated in Uniq. If a franchisee is forced to pay a price in excess of a bona fide wholesale price for goods or if the franchisee is required to purchase excess goods for which there is no well-established market in this state, the excess costs borne by the franchisee in favor of the franchisor effectively constitute a transfer of wealth from the franchisee to the franchisor, which in turn constitutes the payment of an indirect franchise fee as contemplated by MCL 445.1502(3)(c).
Pursuant to  3.02 of the 1997 Agreement, Hamade was required to purchase his monthly quota of fuel at the dealer tank wagon price (DTW) in effect at the time and place of delivery. In their original motion for summary disposition, defendants presented the affidavit of Albert B. Khleif, who averred that the DTW is the wholesale price of fuel sold to Sunoco dealers. Furthermore, in their subsequent motion for summary disposition, defendants presented the affidavit of Paul T. Schwab. In his affidavit, Schwab stated that Sunoco markets fuel both to direct dealers, such as Hamade, and to jobbers or distributors, who then resell the fuel to dealers or market the fuel from their own *243 stations. Schwab averred that he and his staff are responsible for setting the daily DTW and that it is determined by a variety of factors, including local competitive factors, historic sales volume, market trends, Sunoco's costs and margin, and current inventory. Schwab also averred that the final DTW for each day is the price charged to all dealers within the applicable zone, with the goal that the price will be from six to nine cents below the street average in order to allow dealers to realize a profit.
In response to these affidavits, plaintiff failed to present any substantively admissible evidence that the DTW was anything other than a bona fide wholesale price. Plaintiff merely alleged that Sunoco charged him a higher DTW that included charges for the equipment loaned to him and did not properly reflect a decrease in the federal excise tax. In support of this allegation, plaintiff presented the trial court with a copy of a station evaluation and an invoice for one of his fuel purchases. However, these exhibits do not on their face support plaintiff's contention that he was charged a higher DTW than other dealers within his zone, and plaintiff failed to offer any testimony by a witness capable of interpreting these documents. Hence, this evidence was insufficient to create a factual question whether the DTW paid by Hamade was anything other than a bona fide wholesale price.
In addition, plaintiff failed to present evidence that his fuel quota was so unreasonably large that it essentially rendered his inventory illiquid. First, on appeal, plaintiff does not contest that there is a well-established market in this state for fuel. See Rule 445.101(7). Second, although plaintiff correctly notes that, under the 1989 Agreement, his fuel quota was only 40,000 gallons a month, there is also record evidence that for the entire year preceding the signing of the 1997 Agreement, Hamade was selling a monthly average of fuel closer to the agreed-upon amount of 94,000 gallons a month. Furthermore, Hamade successfully met his fuel quota for two years after the signing of the 1997 Agreement. Hence, the fuel quota negotiated in the 1997 Agreement appears reasonable in light of Hamade's sales history and, therefore, did not constitute an indirect franchise fee. See James v. Whirlpool Corp., 806 F.Supp. 835, 843 (E.D.Mo., 1992) (concluding that the plaintiff failed to establish the indirect payment of a franchise fee where it presented no evidence that the inventory requirements were unreasonable).
On appeal, plaintiff argues that Sunoco's subsequent decision to permit another Sunoco station to operate on the same line of traffic and its delivery of allegedly tainted fuel effectively eliminated his ability to meet the 94,000-gallon monthly quota. These subsequent developments, plaintiff further contends, rendered his inventory illiquid and, as a result, transformed the 1997 Agreement into a franchise agreement. This argument is without merit. The MFIL imposes notice, disclosure, and substantive requirements on a contract or agreement that meets the definition of "franchise." See, e.g., MCL 445.1505, 445.1507a, 445.1508, and 445.1527. Because the MFIL seeks to protect prospective franchisees by imposing various requirements on the franchisor in connection with the offer and sale of a franchise, see MCL 445.1504(1), whether a contract or agreement constitutes a franchise for purposes of the MFIL must be determined from the circumstances present at the time of the offer or sale. Subsequent market developments cannot transform an agreement that was not subject to the MFIL at its inception into a franchise subject to the requirements imposed by *244 the MFIL. Thus, the fact that Hamade later had difficulty meeting the quota is irrelevant to a determination whether the agreement constituted a franchise within the meaning of MCL 445.1502(3) at the time it was offered or sold.
Furthermore, there is also no record evidence to support plaintiff's claim that Sunoco required him to purchase signs, toys, or other articles with Sunoco's trademarks. Likewise, there is no evidence that such goods were purchased at anything other than a bona fide wholesale price. Consequently, plaintiff's contention that he indirectly paid a franchise fee through other inventory requirements is also unsupported by the record.
Plaintiff next contends that the $10,000 collateral deposit required by the 1997 Agreement constituted the payment of an indirect franchise fee. We disagree.
Pursuant to  1.07 of the 1997 Agreement, Hamade was required to deposit $10,000 with Sunoco as collateral. Under  4.02(b) of the agreement, the $10,000 served as collateral "for the discharge and payment of all or any part of any present, past or future obligation, indebtedness or liability of Dealer to Company." Although the collateral deposit was held by Sunoco and subject to its claims, see  3.04 of the 1997 Agreement, under  4.05 and 4.06 of the agreement, Sunoco was obligated to pay interest on the collateral deposit and had to return it to Hamade at the end of the agreement. For the definition of "franchise fee" to be satisfied, the franchisee must either be required or agree to pay the franchisor a fee for the right to enter into a business under a franchise agreement; i.e., there must be a transfer of wealth from the franchisee to the franchisor. See MCL 445.1503(1); see also Implement Service, Inc. v. Tecumseh Products Co., 726 F.Supp. 1171, 1179 (S.D.Ind., 1989) (interpreting Indiana franchise law and holding that a good or service must be rendered to the franchisor and not to a third party in order to constitute an indirect payment of a franchise fee); Uniq, supra at 760 (noting that excess inventory requirements can constitute an indirect transfer of wealth from the franchisee to the franchisor). Because Hamade retained ownership of the deposited funds and was not deprived of the time value of the funds, there was no transfer of wealth to Sunoco. Consequently, the collateral deposit did not constitute the payment of a franchise fee.
Plaintiff next argues that Sunoco compelled him to indirectly pay a franchise fee when it conditioned approval of the 1997 Agreement on the making of improvements to his station.
As already noted, from 1992 through the signing of the 1997 Agreement, Hamade continued to operate the station as a Sunoco station through extensions of the 1989 Agreement. In 1997 Hamade made numerous improvements to his station, including the remodeling of his garage bays into a store, the replacement of his underground storage tanks, and improvements to the fuel pump locations and the canopy covering them. Hamade averred that the total cost of these improvements was from $400,000 to $500,000 and that Sunoco required these improvements before it would agree to enter into the 1997 Agreement. Assuming that Sunoco did in fact require Hamade to make the improvements before it would enter into the 1997 Agreement, plaintiff has failed to demonstrate how such requirements constituted the indirect payment of a franchise fee to Sunoco.
Plaintiff did not present any evidence that the moneys spent on the improvements were paid directly to Sunoco. Indeed, Hamade averred that he hired the Oscar W. Larson Co. to perform the work. *245 Furthermore, in order to help Hamade make improvements to his station, Sunoco loaned over $40,000 worth of equipment to him and gave him $55,000 to pay for the installation of the loaned equipment. In addition, the improvements to Hamade's station primarily benefited Hamade. This is certainly true of the remodeling of the garage bays into a convenience store, whose profits benefited only Hamade. Finally, although Sunoco indirectly benefited from the improvements to the extent that the improvements might contribute to an increase in the sale of fuel, any increase in the sale of fuel also benefited Hamade. Because the improvements primarily benefited Hamade rather than Sunoco, plaintiff failed to establish that the improvements constituted the payment of a direct or indirect fee to Sunoco for the privilege of entering into a franchise.[10]
Next, plaintiff contends that Sunoco charged him an indirect franchise fee when it conditioned its consent to the 1997 Agreement on his ability to repay the $55,000 loan made with the signing of the agreement. Again, we disagree.
Pursuant to  2.02 of the 1997 Agreement, Sunoco agreed to pay Hamade $55,000 in up-front consideration to cover the costs of installing the loaned equipment. Although the $55,000 was immediately paid to Hamade upon entering into the agreement, pursuant to  2.03 of the agreement, the $55,000 advance was actually amortized over the term of the agreement. If the agreement was terminated for any reason, Hamade was obligated to return the unamortized portion of the advance. Under the terms of  2.03, the amortization of the advance was linked to the total fuel Hamade was required to purchase during the period covered by the agreement. For every gallon of fuel Hamade purchased, the advance was amortized by ".00975 cents."[11] Thus, if Hamade fulfilled his obligations under the 1997 Agreement, he would not be obligated to return the advanced funds. Consequently, on the face of the 1997 Agreement, the $55,000 advance was not a loan. Instead, it was a transfer of wealth from Sunoco to Hamade, albeit a transfer that was amortized over the life of the agreement.
The only evidence submitted by plaintiff to refute the plain terms of the 1997 Agreement was his affidavit, in which he stated that the $55,000 advance was a loan,[12] and the station evaluation, which plaintiff claimed indicated that Sunoco assessed a fee on every gallon sold to Hamade to cover the cost of the advance and loaned equipment. However, mere conclusory allegations within an affidavit that are devoid of detail are insufficient to create a question of fact. Quinto, supra at 371-372, 547 N.W.2d 314; MCR 2.119(B)(1). *246 Likewise, as noted above, the station evaluation does not on its face support the contention that Sunoco included hidden fees in the price it charged Hamade for his fuel, and plaintiff failed to present the testimony of a witness capable of meaningfully interpreting the station evaluation. Hence, Hamade's affidavit and the station evaluation were insufficient to refute the plain language of the 1997 Agreement and establish a question of fact regarding whether the $55,000 advance was a loan.
Even were we to conclude that the $55,000 advance was a loan that Hamade was obligated to repay, the repayment of the $55,000 would not constitute the payment of a franchise fee. Under the plain language of the MFIL, a payment will not constitute a franchise fee unless the payment was for the right to enter into business under a franchise agreement. MCL 445.1503(1). Plaintiff presented no evidence that Hamade was required to accept a loan from Sunoco as a condition of entering into the 1997 Agreement. Likewise, the repayment of a loan principal is not a transfer of wealth from the franchisee to the franchisor. Finally, although the payment of interest in excess of a fair market rate on a loan that the franchisor required of the franchisee might arguably constitute the indirect payment of a franchise fee, plaintiff did not present any evidence that he was charged any interest at all, let alone interest in excess of a fair market rate. Consequently, the $55,000 advance, even if it were a loan, could not be characterized as the indirect payment of a franchise fee.
Plaintiff next argues that Sunoco charged him an indirect franchise fee by compelling him to attend seminars. Although mandatory attendance at seminars for which the franchisee must pay a fee might constitute the payment of an indirect franchise fee, see Ricoh, supra at 136, plaintiff completely failed to support the claim that he was required to attend seminars and pay a fee for his attendance with any substantively admissible evidence.[13] In contrast, defendants presented the affidavit of Thomas E. Iannetta, who stated that Sunoco does not require attendance at seminars for dealers such as Hamade and does not charge a fee for the voluntary seminars that it does offer to its dealers. Consequently, plaintiff failed to create a question of fact regarding whether he indirectly paid a franchise fee through attendance at mandatory seminars.
Finally, plaintiff contends that Sunoco charged him a hidden fee for each gallon for the more than $40,000 worth of loaned equipment and failed to pass on the savings occasioned by a decrease in the federal excise tax on fuel. Plaintiff's only evidentiary support for these allegations is the station evaluation and the invoice already discussed. Because these documents do not facially establish that Sunoco added hidden fees to the price Hamade paid for fuel, they are insufficient to rebut the evidence presented by defendants that Hamade paid the same DTW as every other dealer within his price zone.
Because plaintiff failed to present evidence sufficient to create a question of fact regarding whether Hamade paid a franchise fee, the trial court properly determined that the 1997 Agreement was not a franchise for purposes of the MFIL. Therefore, summary disposition of plaintiff's *247 claims based on the MFIL was appropriately granted.

III. Contract and Fraud Claims
Plaintiff next argues that the trial court erred when it determined that the integration clause contained in the 1997 Agreement barred the admission of extrinsic evidence to prove that Sunoco promised him that it would not permit another Sunoco station within a certain distance of his station. For this reason, plaintiff further argues, summary disposition was improperly granted. We disagree.
This Court reviews de novo the trial court's decision to grant summary disposition of these claims. Moore, supra at 517. This Court also reviews de novo the proper interpretation of a contract. Clark v. DaimlerChrysler Corp., 268 Mich.App. 138, 141, 706 N.W.2d 471 (2005). Likewise, whether a contract's terms are ambiguous is a question of law this Court reviews de novo. Wilkie v. Auto-Owners Ins. Co., 469 Mich. 41, 47, 664 N.W.2d 776 (2003). When a contract is unambiguous, it must be enforced according to its terms. DaimlerChrysler Corp. v. G-Tech Professional Staffing, Inc., 260 Mich.App. 183, 185, 678 N.W.2d 647 (2003).
Plaintiff argued in the trial court that Sunoco breached the 1997 Agreement when it permitted another Sunoco station to open down the road from Hamade's station. In support of this argument, plaintiff presented evidence that Sunoco induced Hamade to enter into the 1997 Agreement by promising him that it would not allow another Sunoco station to open within three to five miles of Hamade's station on the same line of traffic. Plaintiff also contended that this same evidence supported his fraud claims. The trial court disagreed and determined that plaintiff was barred by the parol evidence rule from presenting this evidence to vary the unambiguous terms of the 1997 Agreement and, for that reason, ruled that plaintiff's contract and fraud claims must fail. On appeal, plaintiff argues that the trial court erred in applying the parol evidence rule to bar the evidence that Sunoco promised Hamade an exclusive territory.
In UAW-GM Human Resource Ctr. v. KSL Recreation Corp., 228 Mich.App. 486, 492, 579 N.W.2d 411 (1998), the Court explained the nature of the parol evidence rule:
The parol evidence rule may be summarized as follows: "[p]arol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous." Schmude Oil Co. v. Omar Operating Co., 184 Mich.App. 574, 580, 458 N.W.2d 659 (1990). This rule recognizes that in "[b]ack of nearly every written instrument lies a parol agreement, merged therein." Lee State Bank v. McElheny, 227 Mich. 322, 327, 198 N.W. 928 (1924). "The practical justification for the rule lies in the stability that it gives to written contracts; for otherwise either party might avoid his obligation by testifying that a contemporaneous oral agreement released him from the duties that he had simultaneously assumed in writing." 4 Williston, Contracts,  631. In other words, the parol evidence rule addresses the fact that "disappointed parties will have a great incentive to describe circumstances in ways that escape the explicit terms of their contracts." Fried, Contract as Promise (Cambridge: Harvard University Press, 1981) at 60.[14]
*248 Although the parol evidence rule generally bars the submission of extrinsic evidence, there are exceptions to its application. First, it is a prerequisite to application of the parol evidence rule that there be a finding that the parties intended the written instrument to be a complete expression of their agreement with regard to the matters covered. For this reason, "[e]xtrinsic evidence of prior or contemporaneous agreements or negotiations is admissible as it bears on this threshold question of whether the written instrument is such an `integrated' agreement." NAG Enterprises, Inc. v. All State Industries, Inc., 407 Mich. 407, 410, 285 N.W.2d 770 (1979). Second, extrinsic evidence may be presented to attack the validity of the contract as a whole. Thus, extrinsic evidence may be presented to show (1) that the writing was a sham, not intended to create legal relations, (2) that the contract has no efficacy or effect because of fraud, illegality, or mistake, (3) that the parties did not integrate their agreement or assent to it as the final embodiment of their understanding, or (4) that the agreement was only partially integrated because essential elements were not reduced to writing. Id. at 410-411, 285 N.W.2d 770.
In the present case, plaintiff does not argue that the contract was a sham, illegal, or the product of a mistake. Instead, plaintiff argues that he was fraudulently induced into executing an incomplete agreement by Sunoco's representation that he did not need an exclusive territory clause because it was Sunoco's policy not to authorize a new Sunoco station within three to five miles of an existing station. Although plaintiff claims that the 1997 Agreement was incomplete, it contained the following merger clause:

NOTE TO DEALER: BEFORE SIGNING IN THE SPACE PROVIDED BELOW YOU SHOULD CAREFULLY READ ALL PARTS OF THIS AGREEMENT, WHICH IS A BINDING LEGAL DOCUMENT CONTAINING SEVERAL PARTS AND ATTACHMENTS (INCLUDING ALL ADDENDA, AMENDMENTS, SCHEDULES AND DOCUMENTS INCORPORATED HEREIN). THIS IS THE ENTIRE AGREEMENT BETWEEN COMPANY AND DEALER, AND MERGES AND SUPERCEDES ALL PRIOR AGREEMENTS, UNDERSTANDINGS, REPRESENTATIONS AND WARRANTIES (ORAL OR WRITTEN, EXPRESS OR IMPLIED) CONCERNING DEALER'S OPERATION OF A FRANCHISE AT THE PREMISES. NO MODIFICATIONS OR UNDERSTANDING CONCERNING THIS AGREEMENT SHALL BE BINDING UNLESS IN WRITING AND SIGNED BY COMPANY'S AUTHORIZED REPRESENTATIVE.
This clause appears alone at the top of the page containing the signature lines for the parties. No other clauses appear on this page. Furthermore, a substantially similar clause appears at  3.25(d) of the 1997 Agreement. Hence, by its unambiguous terms, the 1997 Agreement represents the "entire agreement" between Sunoco and Hamade and any prior "agreements, understandings, representations and warranties" were merged and superseded by the agreement. Where the parties have included an express integration or merger clause within the agreement, "it is conclusive and parol evidence is not admissible to show that the agreement is not integrated except in cases of fraud that invalidate the integration clause or where an agreement is obviously incomplete `on its face' and, therefore, parol evidence is necessary for the `filling of gaps.'" UAW-GM, supra at 502, 579 N.W.2d 411, quoting 3 Corbin, Contracts,  578, p. 411. The 1997 Agreement *249 is detailed and complete on its face; therefore, there is no need to fill gaps. Hence, plaintiff is left only with his claim that Sunoco's representations constituted fraud.
Parol evidence is generally admissible to demonstrate fraud, which, if proved, would render the contract voidable by the innocent party. UAW-GM, supra at 503, 579 N.W.2d 411.
However, in the context of an integration clause, which releases all antecedent claims, only certain types of fraud would vitiate the contract. 3 Corbin, Contracts,  578, p. 411, states in part:
"To establish fraud, it is not sufficient merely to show that the writing states that there was no antecedent agreement when the fact is that there had been one. If by artifice or concealment, one party induces the other to suppose that the antecedent agreement is included in the writing, or to forget that agreement and to execute an incomplete writing, while describing it as complete, the written provision may be voidable on the ground of fraud."
In other words, while parol evidence is generally admissible to prove fraud, fraud that relates solely to an oral agreement that was nullified by a valid merger clause would have no effect on the validity of the contract. Thus, when a contract contains a valid merger clause, the only fraud that could vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that invalidates the entire contract including the merger clause. 3 Corbin, Contracts,  578. [Id.]
In the present case, plaintiff's fraud claims were based solely on an oral representation by Sunoco that it would not authorize a Sunoco station within three to five miles of Hamade's station. Because this representation was expressly nullified by the integration clause, if the integration clause is valid, fraud based on this representation will have no effect on the validity of the contract. Id. Thus, plaintiff must demonstrate that the fraud in question invalidated the integration clause itself.
Plaintiff does not contend that he was misled into believing that the 1997 Agreement contained a clause granting him an exclusive territory when in fact it did not. Instead, plaintiff argues that he was induced into entering into an incomplete agreement that described itself as complete. In order to prevail on this theory, plaintiff must show not only that he requested the inclusion of a clause guaranteeing him an exclusive territory, but also that, as a result of Sunoco's fraudulent representations, he was induced to forget about the inclusion of that term and sign an agreement that omitted it while describing itself as the parties' entire agreement. By his own admission, Hamade did not forget about the inclusion of the term. Rather, he elected to forgo a term providing for an exclusive territory on the basis of Sunoco's alleged representation. Hamade knew that the agreement he signed did not contain a clause granting him an exclusive territory. His only claim on appeal is that he was led to believe that he did not need such a clause. Furthermore, the 1997 Agreement actually contains an express term applicable to Sunoco's decision to authorize another Sunoco station near Hamade's station. Pursuant to  3.24(a)(2), Hamade warranted to Sunoco that
[t]here have been no promises, claims or representations made to [Hamade] by [Sunoco] or its representatives of any kind, including but not limited to promises (i) concerning price, quality or quantity of products and services sold or *250 supplied by [Sunoco]; (ii) the condition, future repairs to or replacement of Loaned Equipment; (iii) present or future market conditions or competitive activities other than as set forth in this Agreement or any other written documents signed by the parties as a part of the Franchise relationship. [Emphasis added.]
In light of this warranty, plaintiff may not now claim that the absence of an exclusive territory clause within the 1997 Agreement rendered the agreement incomplete.
Plaintiff failed to demonstrate fraud that would invalidate the integration clause or otherwise invalidate the entire contract. UAW-GM, supra at 505, 579 N.W.2d 411. Furthermore, because the valid integration clause nullified all prior and contemporaneous agreements, understandings, representations, and warranties, plaintiff may not use parol evidence to contradict the explicit terms of the integration clause. Id. at 507, 579 N.W.2d 411. Hence, plaintiff's contract claim must fail. Likewise, the valid integration clause renders reliance on the representation unreasonable as a matter of law. Id. at 504, 579 N.W.2d 411. Therefore, plaintiff's claims based on silent fraud, fraudulent misrepresentation, and innocent misrepresentation, all of which require reliance on a misrepresentation, see id., must also fail. Consequently, the trial court did not err when it granted summary disposition in favor of defendants on plaintiff's contract and fraud claims.
Plaintiff also argues that the extrinsic evidence is admissible to show that there was no mutual assent to the integration clause contained in the 1997 Agreement. Plaintiff relies on the dissent in UAW-GM, which argued that extrinsic evidence is admissible with regard to the threshold question whether the parties assented to the written document as a completely integrated contract, even if the contract contains a merger or integration clause. Id. at 515-517, 579 N.W.2d 411 (D.E. Holbrook, Jr., J., dissenting). However, the majority rejected the dissent's argument that parol evidence is admissible to prove that a contract was not assented to as an integrated contract when the contract contains an express integration clause. See id. at 502, 507 n. 13, 579 N.W.2d 411. Because the majority opinion is binding precedent, see MCR 7.215(J)(1), plaintiff's reliance on the dissent is misplaced.

IV. Conclusion
Because Hamade did not directly or indirectly pay a "franchise fee," as that term is defined by MCL 445.1503(1), the 1997 Agreement did not qualify as a "franchise" under MCL 445.1502(3). Therefore, the 1997 Agreement was not subject to the requirements imposed by the MFIL, and summary disposition of plaintiff's MFIL claims was appropriately granted. Likewise, the trial court properly determined that, pursuant to the parol evidence rule, plaintiff could not present extrinsic evidence to contradict or vary the terms of the fully integrated 1997 Agreement. Consequently, summary disposition of plaintiff's contract and fraud claims was also properly granted.
Given our resolution of these issues, we need not address plaintiff's argument that the 1997 Agreement was not exempted from the requirements imposed by the MFIL pursuant to the exception stated under MCL 445.1506(1)(e) or that the economic loss doctrine does not bar his fraud or MFIL claims. We also decline to address plaintiff's claim that the economic loss doctrine does not bar his tortious interference with a business relationship claim. On appeal, plaintiff failed to properly raise and brief an argument questioning the validity of the trial court's grant of *251 summary disposition on this claim. Therefore, plaintiff abandoned any claim of error in the grant of summary disposition on his tortious interference claim. People v. Van Tubbergen, 249 Mich.App. 354, 364-365, 642 N.W.2d 368 (2002).
Affirmed.
NOTES
[1] Nouhad Hamade is not a party to this appeal. On April 1, 2002, the parties stipulated the dismissal of Nouhad from the lawsuit, and, on April 16, 2002, the trial court entered an order to that effect. However, Nouhad was retained as a plaintiff on the caption of the first amended complaint, which was filed on July 3, 2003, and was not subsequently dismissed from the action. Hence, the lower court pleadings use the plural "plaintiffs." However, for ease of reference we shall use the singular "plaintiff" throughout this opinion.
[2] Plaintiff's original complaint only named Sunoco as defendant. In plaintiff's first amended complaint, plaintiff added Sunoco's officers and board of directors as of 2003, as well as four Sunoco employees who had dealings with Hamade, as defendants. For ease of reference, we shall use "Sunoco" and "defendants" interchangeably.
[3] The agreement was titled "Dealer Supply Franchise Agreement" because it constituted a franchise for purposes of the federal Petroleum Marketing Practices Act. See 15 USC 2801 et seq.
[4] MCL 445.1501 et seq.
[5] See MCL 440.1101 et seq.
[6] See MCL 445.771 et seq.
[7] We note that, in plaintiff's statement of the question presented, plaintiff challenges the validity of the trial court's grant of summary disposition on all of his "remaining claims," without specifying which claims constitute "remaining claims." This Court need not address issues that are insufficiently argued or briefed on appeal. People v. Van Tubbergen, 249 Mich.App. 354, 364-365, 642 N.W.2d 368 (2002). Accordingly, we shall limit our analysis to those issues properly raised and argued in plaintiff's brief.
[8] The term "bona fide wholesale price" "refers to a price that constitutes a fair payment for goods purchased at a comparable level of distribution, and no part of which constitutes a payment for the right to enter into, or continue in, the franchise business." Rule 445.101(6). Goods may include "goods sold to the franchisee for resale, as well as fixtures, equipment, raw materials, supplies, and other goods used by the franchisee in the conduct of the franchise business." Id.
[9] The existence of a well-established market is a question of fact determined by analyzing the following nonexhaustive list of factors: (1) the number of presently existing wholesale and retail outlets of the franchisor or competitors in a similar line of business, (2) the quantity and price of like or similar products presently sold in an existing geographical area in Michigan, (3) the ability of the purchaser to resell at the suggested retail price of the manufacturer or wholesaler or at a reasonable markup over the purchaser's cost, and (4) the ability of the purchaser to return any unsold portion of the product without penalty. Rule 445.101(7).
[10] In his reply brief on appeal, plaintiff argues that the trial court impermissibly engaged in fact-finding when it determined that Sunoco did not benefit from, among other things, the improvements to his station. We disagree. When it noted that the improvements benefited Hamade rather than Sunoco, the trial court simply recognized that plaintiff failed to present evidence that the improvements constituted a transfer of wealth from Hamade to Sunoco.
[11] This is the factor as stated in the agreement. However, we note that, when this factor is applied to Hamade's required purchase amount of 5.64 million gallons, it is clear that the number is off by two decimal points and that the factor necessary to amortize the advance is actually 0.975 cents (or $0.00975) a gallon.
[12] This affidavit is directly contradicted by Hamade's deposition testimony, in which he acknowledged that, if he fulfilled the terms of the contract, he would not have been obligated to return any portion of the $55,000.
[13] In his brief on appeal, plaintiff cites his brief in response to defendants' motion for summary disposition in support of this contention. However, the reply brief merely contains a conclusory statement that Hamade was required to attend these seminars without citation to record evidence.
[14] The parol evidence rule applicable to transactions in goods is codified at MCL 440.2202.