**P.A.L. INVESTMENT GROUP, INC., d/b/a Staff Builders Home Health Care, Plaintiff,**

v.

**STAFF–BUILDERS, INC. Tender Loving Care Health Care Services Inc., Staff Builders International Inc., Defendants–Counter Plaintiffs,**

v.

**P.A.L. Investment Group, Inc., d/b/a Staff Builders Home Health Care, Alice Salazar, Counter–Defendants.**

Nos. 99–CV–76381–DT, 99–CV–60722–AA.

United States District Court, E.D. Michigan, Southern Division.

Aug. 23, 2000.

---

Steven M. Wolock, Southfield, MI, for plaintiff.

Karl V. Fink, Ann Arbor, MI, for defendants.

## OPINION AND ORDER DENYING COUNTER-PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

STEEH, District Judge.

This lawsuit arises out of an alleged breach of a franchise agreement for the operation of a home health care services business in Oakland County which primarily aids victims of automotive accidents. Under the franchise agreement, plaintiff P.A.L. Investment Group, Inc. (PAL) provided home care services while defendant Staff Builders, Inc. (Staff Builders) paid PAL a monthly royalty, billed all clients, and paid all employees. Staff Builders is in the business of providing home health care services and health care staffing through its company owned and franchisee owned branch offices. Plaintiff filed the initial lawsuit on December 23, 1999, alleging breach of contract arising out of Staff Builders' failure to pay its employees, to bill clients, and to pay PAL royalties owing. On January 24, 2000, Staff Builders filed a counterclaim alleging that a recent Blue Cross and Blue Shield audit revealed that PAL overbilled the insurer and as a result, Staff Builders sought reimbursement of overpaid royalties. On May 18, 2000, PAL terminated its franchise agreement. On July 18, 2000, this court granted Staff Builder's unopposed motion to amend its counterclaim by adding PAL's President, Alice Salazar, as a defendant and adding six new counts alleging state law violations for PAL's alleged confiscation of trade secret information and proprietary materials and the improper solicitation of clients and employees in violation of restrictive covenants in the franchise agreement. PAL responds that the covenant not to compete and covenant restricting the use of confidential information are null and void based on Staff Builder's initial material breach of the franchise agreement, and further maintains that in running its own unaffiliated home services business under the name Acclaimed Health Care, it has not used defendants'

tradename, proprietary materials or trademarks. Having carefully considered the extensive briefs and evidentiary exhibits submitted by the parties, and having given due consideration to oral argument heard on August 21, 2000, counter-plaintiff's motion for a preliminary injunction must be denied because it has failed to show a substantial likelihood of success on the merits or any of the other factors required for injunctive relief to enter.

## I. BACKGROUND

### A. The Parties

This is essentially a breach of contract dispute. Jurisdiction is premised on diversity of citizenship. PAL is a Michigan corporation in the business of providing home health care services. PAL is owned and managed by Alice Salazar. PAL was incorporated on March 1, 1995. Staff Builders is a New York corporation which has been in the business of operating its own home health care services centers and franchising the same for over thirty years. Prior to the franchise agreement in dispute here, Staff Builders operated a health care service center in Oakland County with annual revenues in excess of $1.5 million.

### B. The Franchise Agreement

On March 17, 1995, PAL entered into a franchise agreement with Staff Builders through which it was to operate home health care services in Oakland County with the support of Staff Builders. As part of the agreement, Staff Builders closed its company owned center. Under the parties' franchise agreement, Staff Builders billed clients, administered employee payroll, and paid PAL a monthly royalty based on 60 percent of PAL's gross margin, which the agreement defines as net sales less direct costs. The royalty was due no later than 45 days after the last day of the month in which services were rendered. In addition, Staff Builders provided PAL with training, staffing, and promoting the business.

### C. Staff Builders' Alleged Breach of the Franchise Agreement

Beginning in August, 1999, Staff Builders bounced royalty checks or failed to pay them at all. Staff Builders did not pay royalties owing for October and November, 1999 until mid-February, 2000. In addition, Staff Builders failed to pay PAL's royalty for January, February and March, 2000. Staff Builders never explained its failure to pay royalties. PAL's sole source of income for the operation of its health care services business was royalty checks. Staff Builder's repeated failure to pay royalties owing put PAL on the brink of insolvency. (Salazar Affidavit ¶ 16).

According to the complaint, Staff Builders also failed to timely and properly bill clients, failed to properly administer the payroll often overpaying or underpaying its employees, and failed to pay employee health insurance claims. In support of this assertion, PAL has submitted several invoices showing that Staff Builders billed at least five patients as much as six months late for services rendered. Billing and payroll problems escalated the last three months of 1999 after Staff Builders spun off its home health care unit as Tender Loving Care Health Care Services, Inc. (TLCS) on October 20, 1999. According to the affidavit of PAL's president, Salazar, beginning on October 22, 1999, Staff Builders failed to deliver paychecks on time and/or failed to pay employees amounts owing. (Salazar affidavit ¶ 22). As a result, morale plummeted, several employees quit and several others failed to report to work. Id. at ¶ 21. In addition, Staff Builders changed PAL's computer program in October, 1999. Id. at ¶ 25. Although the change was supposed to be an upgrade, PAL experienced repeated problems with billing statements after the change. Id. In the past three years, Staff Builders and TLCS have lost about 61 franchisees. Based on TLCS's recent SEC filings, Deloitte & Touche's audit concluded that there is "substantial doubt

about [the company's] ability to continue as a going concern." (PAL's Exhibit 1 at 28).

On March 24, 2000, PAL President Alice Salazar wrote to Staff Builders' CEO Steve Savitski complaining that Staff Builders was "destroying [her] business" through its "untimely billing, its incompetent billing, its unresponsiveness to client complaints, its incompetent administration of its payroll function, its failure to pay [her] royalties and its bad faith treatment of [her] franchise." (PAL's Exhibit B). Receiving no response to her March 24th letter, Alice Salazar wrote to Savitski again on May 18, 2000 advising him that Staff Builders' failure to pay PAL's March royalty, after also failing to pay the January and February royalty, was the final straw and that PAL was terminating the franchise agreement as of midnight the following day. (PAL's Exhibit I). In unequivocal terms, Salazar declared, "Your bad faith is evident from your failure to offer any explanation whatsoever for your failure to pay the royalties due us. Thus, as far as we are concerned, the Franchise Agreement is rescinded and is, and has been for months, null and void. You can hardly expect us to be bound by that contract when you apparently feel so free to ignore it." *Id.*

Beginning on May 20, 2000, PAL began doing business under the name of Acclaimed Health Care (Acclaimed). Salazar's affidavit states that Acclaimed has never used Staff Builders' name or trademarks, training materials, or marketing materials. (Salazar affidavit ¶ 44). Her affidavit further states that the week of May 13, 2000, all of Staff Builders' policies and procedures manuals, training manuals, Medicare manuals, form manuals, recruitment guides, job description manuals, franchise quick reference guides, and home care guides were boxed and stored off-site. (Salazar affidavit ¶ 45). Salazar

further states that all employee and patient files, with the exception of files being used to bill pre-termination services, and computer monitors, have been boxed and made available for delivery to Staff Builders. *Id.* at ¶ 46.

### D. Staff Builders' Counterclaim

On June 12, 2000, Staff Builders sought leave of court to file an amended counterclaim. After PAL responded that it did not oppose the amendment sought as long as the discovery period was extended, the court granted the unopposed motion.

In the amended counterclaim, Staff Builders alleges that PAL has confiscated its confidential and trade secret information including employee and client information which PAL is allegedly using to solicit Staff Builders' accounts and personnel in violation of an explicit restriction of confidential information and covenant not to compete set forth in the franchise agreement. Staff Builders further accuses PAL of failing to submit proper invoices and time records which allegedly caused Staff Builders' billing and payroll problems. In addition, Staff Builders accuses PAL of falsely holding itself out as a Staff Builders' entity through its improper use of a telephone number owned by Staff Builders, and alleged continued use of promotional, procedural and training materials containing the Staff Builders' mark. PAL responds that it ceased using Staff Builders' telephone number beginning the first week after it terminated the franchise agreement, that any billing problems were caused by Staff Builders' alone, that it has stored all procedural and training manuals off-site, and ceased using Staff Builders' computers other than to process payroll for services incurred prior to the termination. Finally, Staff Builders accuses PAL of encouraging other persons to terminate contracts with Staff Builders.[1] Staff Builders seeks damages and/or injunctive

---

1. It is unclear if "persons" refers to other franchisees, vendors, suppliers, clients, or others.

relief under the theory that PAL is liable for (I) breach of the franchise agreement, (II) conversion of trade secrets, customer lists and confidential business information in violation of the common law and the Michigan Uniform Trade Secrets Act, (III) common law and statutory trademark infringement, (IV) violations of and infringement under the Lanham Act, 15 U.S.C. § 1125(a), (V) interference in the contracts and business expectancies of Staff Builders, and (VI) unfair competition pursuant to the common law and Lanham Act.

E.  *Staff Builders' Motion for Preliminary Injunction*

Now before the court is Staff Builders' motion for a preliminary injunction. Through its motion, Staff Builders seeks to enjoin PAL, now operating as Alliance, from soliciting any of Staff Builders' former employees or patients, to require PAL to return all proprietary and trade secret materials such as training and procedure manuals, and to return all patient and employee records. Staff Builders contends that PAL is breaching non-compete and restriction on trade secret restrictive covenants set forth in the franchise agreement by soliciting former employees and patients of Staff Builders and continuing to use Staff Builders' confidential information and materials. In support of its motion, Staff Builders relies on the affidavits of its CEO, Ed Teixeira; its Vice–President and General Counsel, Renee Silver; Associate National Director of Regulatory Affairs, Desiree Davila; and Vice–President of Billing, Patricia Ariel. PAL opposes the motion on the grounds that it has not used any of Staff Builders' trade secrets, proprietary information and proprietary marks. Specifically, PAL claims it has not used Staff Builders' name, trademarks, training materials, procedures manuals or marketing materials since it terminated the franchise agreement and began doing business under the name Acclaimed. In support of its response, it relies on the affidavit of Salazar. It further contends that it has stored off-site all of Staff Build-

er's policies and procedures manuals, training manuals and like documents and has stored all employee and patient files off-site. In addition, it has stored ten computer monitors, keyboards, terminals and related equipment. It has kept two of Staff Builders' computers on-site but only for the limited purpose of billing patients for services rendered prior to the termination. As soon as it terminated the contract, PAL terminated 10 telephone lines of Staff Builders and retained just one of its lines for billing of services prior to the termination date. PAL has supported these assertions by Salazar's affidavit and Staff Builders has submitted no evidence to refute this testimony.

PAL admits that it has competed with Staff Builders but contends that the non-compete agreement is unenforceable based on Staff Builders' material breach of the franchise agreement first through its repeated failure to pay royalties. Although its complaint names numerous other alleged breaches of the franchise agreement due to mistakes and delays in patient billing and repeated payroll errors and delays in paying employees, for purposes of defeating Staff Builders' motion for a preliminary injunction, PAL has limited its argument to Staff Builders' documented failure to pay royalties owing. In its motion for a preliminary injunction, Staff Builders argues that its failure to pay royalties was due to PAL's failure to properly code and enter data onto forms and the computer system. In her affidavit, Staff Builders' Vice–President of Billing claims that PAL was the only franchisee unable to adopt to the new software program. The credibility of this argument is undermined, however, by Staff Builders' failure to notify PAL of any alleged reporting errors at the time the royalties were not paid and of its failure to assert such a specific defense in its initial answer to PAL's complaint. Staff Builders' contention that PAL never terminated the franchise agreement is belied by the absolute clarity of PAL's termination letter.

## II. STANDARD FOR PRELIMINARY INJUNCTION

■ The decision of whether or not to issue a preliminary injunction lies within the sound discretion of the district court. *Golden v. Kelsey–Hayes,* 73 F.3d 648, 653 (6th Cir.1996), *cert. denied,* 519 U.S. 807, 117 S.Ct. 49, 136 L.Ed.2d 13 (1996). In determining whether to grant or deny an injunction, the district court is required to consider four factors:

1. whether the movant is likely to prevail on the merits;

2. whether the movant would suffer an irreparable injury if the court does not grant a preliminary injunction;

3. whether a preliminary injunction would cause substantial harm to others; and

4. whether a preliminary injunction would be in the public interest.

*Connection Distributing Co. v. Reno,* 154 F.3d 281, 288 (6th Cir.1998), *cert. denied,* 526 U.S. 1087, 119 S.Ct. 1496, 143 L.Ed.2d 650 (1999). "None of these factors, standing alone, is a prerequisite to relief; rather, the court should balance them." *Kelsey–Hayes,* 73 F.3d at 653. (citations omitted). A district court is required to make specific findings concerning each of the four factors unless fewer are dispositive of the issue. *Performance Unlimited v. Questar Publishers, Inc.,* 52 F.3d 1373, 1381 (6th Cir.1995) (citations omitted).

## III. ANALYSIS

### A. Likelihood of Success on the Merits

■ Staff Builders argues that it has demonstrated a strong likelihood of prevailing on its breach of contract and Michigan Uniform Trade Secrets Act claims based upon the affidavit testimony of its CEO that PAL is using its confidential and proprietary information and soliciting clients and employees in violation of its franchise agreement. PAL vehemently denies that it is continuing to use any trade secrets, proprietary information or proprietary marks. Through the affidavit testimony of Salazar, PAL has shown that it has ceased using all training, procedural and promotional materials and has stored these items, as well as client and employee records, and computers off-site. Staff Builders has introduced no evidence to refute these claims. Without reaching a decision on the claims, Staff Builders has failed to show a substantial likelihood of success on the merits of its alleged confiscation of trade secret claim under common law contracts analysis or Michigan's Uniform Trade Secrets Act.

■ As to Staff Builders' non-compete claims, which encompass PAL's alleged solicitation of clients and employees, Staff Builders also has failed to show a substantial likelihood of success on the merits. PAL has made a strong showing that Staff Builders materially breached the franchise agreement. If PAL were ultimately to prove this to be the case, PAL would have been within its common law rights in terminating the agreement. The law is well established that a material breach entitles the non-breaching party to rescind a contract. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ran,* 67 F.Supp.2d 764, 776 (E.D.Mich.1999) (citing *Baith v. Knapp–Stiles, Inc.,* 380 Mich. 119, 126, 156 N.W.2d 575, 578 (1968)); *Temple v. Miller's Cove,* 2000 LEXIS 10924 (6th Cir.2000) (applying Michigan law).[2] As noted by this court in *Ran,* the Michigan Supreme Court has "restated the well-established rule that " '[h]e who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform.' " *Ran,* 67 F.Supp.2d at 776 (*citing Baith,*

---

**2.** Although the franchise agreement contains a choice-of law clause requiring the application of New York law, PAL has made a substantial showing that it properly rescinded the agreement, thus, that choice-of-law provision would not govern here. Even if New York law would apply, it also allows the non-breaching party to rescind the agreement. *See, e.g. The Southland Corporation v. Froelich,* 41 F.Supp.2d 227, 246 (E.D.N.Y.1999).

380 Mich. at 126, 156 N.W.2d at 578). "Substantial breach" means a breach which "has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other party." *Id.* (citations omitted). Under Michigan law, in order for a party to rescind the contract, there must be a material breach affecting a substantial or essential part of the contract. *See Omnicom of Michigan v. Giannetti Investment Co.*, 221 Mich. App. 341, 348, 561 N.W.2d 138 (1997). In determining whether a breach is material, the court must weigh how the breach impacts the parties' abilities to carry out the rest of the terms of the contract. *See Walker & Co. v. Harrison*, 347 Mich. 630, 81 N.W.2d 352 (1957) (citing 1 Restatement of Contracts § 275). Where the breach substantially limits the non-breaching party from receiving the benefit of his bargain, the breach is deemed material and the victim of the breach may rescind the deal.

In this case, there is at least a serious question of fact as to whether Staff Builders' admitted failure to pay royalties due amounts to a material breach. This was Staff Builders' primary obligation under the contract and this consideration is the promise which induced PAL to enter the franchise agreement in the first place. Without the royalties, which was PAL's sole source of income, there was simply no way for PAL to pay its employees and meet its operating expenses. Without the royalties, there was no way that PAL could continue to operate its franchise. Staff Builders does not even dispute that it failed to pay PAL royalties. Without the royalties, PAL nearly went out of business.

Staff Builders blames PAL for its failure to pay royalties and accuses PAL of failing to properly code and submit data as the reason for the denial, but this claim lacks contemporaneous factual support. To support this claim, it relies primarily on Ariel's affidavit, and those claims have not been subjected to cross-examination. Moreover, Ariel's affidavit does not state that Staff Builders ever informed PAL of the alleged misreporting problem. At oral argument, Staff Builders did not dispute that there was no contemporaneous written notice of PAL's allegedly faulty bookkeeping. PAL has submitted numerous invoices, which Staff Builders has not disputed, however, showing that Staff Builders repeatedly failed to timely bill patients, often delaying billing by as much as five to six months. (PAL's Exhibits C–H). Staff Builders did not portend that PAL's sloppy data submission was the reason for non-payment when it first answered PAL's complaint in January, 2000. Given the undisputed fact that Staff Builders failed to pay royalties due and owing under the agreement, and given the lack of proof that it gave a contemporaneous explanation for this conduct, there is at least a genuine issue of material fact as to whether PAL properly exercised its right to rescind the agreement.

To the extent Staff Builders contends that PAL never formally terminated or rescinded the franchise agreement, that claim is simply incredulous. Salazar's May 18, 2000 letter could not have been clearer. She wrote in plain, simple and direct terms "as far as we are concerned, the Franchise Agreement is rescinded and is, and has been for months, null and void. You can hardly expect us to be bound by that contract when you apparently feel so free to ignore it." (PAL's Exhibit I). Salazar wrote this letter five months after initiating this lawsuit, at a time, when she was quite likely operating under her counsel's sage advice that Staff Builder's material breach relieved her of any contractual obligations as well. In fact, Salazar correctly anticipated this litigation in that May 18th correspondence and directly advised Staff Builders that "[b]ecause of Staff Builders' material breach of the Franchise Agree-

ment, the non-compete provisions of the Franchise Agreement are void." *Id.*

For the reasons stated above, Staff Builders has failed to show a substantial likelihood of success on the merits. Although the court must weigh all four factors in determining whether or not to grant injunctive relief, the moving party's likelihood of success on the merits is often the most critical. *See, e.g. Connection Distributing, supra,* 154 F.3d at 288 (in cases involving the First Amendment, the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits because the issues of the public interest and harm to the respective parties depends on the constitutionality of the statute). Staff Builders' likelihood of success on the merits is the critical inquiry here as its claim of irreparable injury and harm stems solely from its claim of a legitimate non-compete agreement. If the non-compete agreement is not enforceable, nothing bars PAL from operating a competing home health services business and Staff Builders cannot make the necessary showing of irreparable injury. Having failed to make its threshold showing that it has a substantial likelihood of prevailing on the merits, Staff Builders is not entitled to injunctive relief.

### B. *Irreparable Injury*

It is well established that a preliminary injunction may not be entered where money damages will make the movant whole. *Performance Unlimited, supra,* 52 F.3d at 1382. Staff Builders contends that the loss of its customer goodwill amounts to irreparable harm because the extent of the injury is difficult to compute. *See Basicomputer Corporation v. Scott,* 973 F.2d 507, 512 (6th Cir.1992). Since Staff Builders was able to value the business when it first entered the franchise agreement with PAL, the argument is not convincing now. To the extent Staff Builders argues that injunctive relief is necessary as it will not be able to recover future royalties due to their speculative nature, even if true, the

claim is outweighed by concerns of harm to patients and employees if injunctive relief is granted.

Staff Builders contends it is being irreparably harmed by PAL's admitted conduct in soliciting former clients and employees because that conduct has damaged its reputation and puts all of its franchise relationships at risk by sending a message that the restrictive covenants and non-compete agreements are of no effect. While Staff Builders' argument would be compelling if it could show a substantial likelihood of prevailing on its claim that PAL breached the non-compete clause of its franchise agreement, as discussed above, there is a real question as to whether Staff Builders breached the agreement first thus relieving PAL of its contractual obligations. Staff Builders has not shown injunctive relief is necessary to avoid irreparable harm. At oral argument, Staff Builders claimed that it is in solid financial shape despite some revenue losses attributable to Medicare reform, maintaining about 20 franchisees nationwide, a number which it contends reflects a recent consolidation as opposed to a contraction of business. Under these circumstances, the loss of one franchisee does not appear to amount to irreparable harm necessitating extraordinary relief.

### C. *Substantial Harm to Others*

In contrast to the limited effect PAL's conduct here will have on Staff Builders' reputation and financial well-being if the injunction is not granted, the entry of injunctive relief would severely impact PAL. Unlike Staff Builders which has multistate franchisees and company owned home health care services located nationwide, PAL is solely a Michigan corporation which operates a single business in Oakland County. To enjoin PAL from operating its business, would devastate the company's existence and financially ruin Salazar. In addition to this calamitous effect on PAL and its president, the lives of PAL's employees and patients would be

significantly disrupted were the injunction to enter.

### D. *Public Interest*

In weighing whether the public interest will be served in granting the injunctive relief sought, the scales tip decidedly against injunctive relief. Were the injunction to enter, innocent patients and employees will have their lives disrupted. Without injunctive relief, Staff Builders may still be made whole for alleged breaches of the franchise agreement through the recovery of money damages. Accordingly, injunctive relief must be denied.

### IV. *CONCLUSION*

Balancing the four factors to be considered in determining whether to grant injunctive relief, counter-plaintiffs have failed to demonstrate that their motion for preliminary injunction should be granted. Accordingly,

IT IS ORDERED that counter-plaintiffs' motion for a PRELIMINARY INJUNCTION is DENIED.