CHESTERFIELD EXCHANGE, LLC,
Plaintiff and counter-defendant,

v.

SPORTSMAN'S WAREHOUSE, INC.,
Defendant, counter-plaintiff, and
third-party plaintiff,

v.

Developers Diversified Realty Corp.,
Third-party defendant.

No. 07–12254.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 11, 2008.

Bruce L. Segal, Honigman, Miller, Bloomfield Hills, MI, for Plaintiff and counter-defendant/Third-party defendant.

Timothy P. Dugan, Mark D. Sassak, Deneweth, Dugan, Troy, MI, for Defendant, counter-plaintiff, and third-party plaintiff.

Christopher R. Grote, Lindquist & Vennum, Minneapolis, MN, for Defendant, counter-plaintiff, and third-party plaintiff/Third-party defendant.

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DISMISSING COMPLAINT, COUNTERCLAIM, AND THIRD–PARTY COMPLAINT, AND DENYING SEVERAL MOTIONS IN LIMINE

DAVID M. LAWSON, District Judge.

This lawsuit comes in the aftermath of a signed lease agreement between the plaintiff and defendant for a retail store in a shopping center, which fell through when an anchor tenant pulled out of the development. The crux of the questions presented is whether the participation of the anchor tenant was such an integral part of the agreement (or, indeed, part of the formal agreement at all) that the failure of that event justified defendant Sportsman's Warehouse, Inc. rescinding the lease. Plaintiff Chesterfield Exchange, LLC has brought an action against Sportsman's for specific performance of the lease and damages; Sportsman's counterclaimed for fraud and joined Chesterfield's leasing agent, Developers Diversified Realty Corporation (DDR), as a third-party defendant on the same theory. Both sides filed motions for summary judgment, and the Court heard oral argument from the par-

ties on August 6, 2008. The Court now finds that there are no material fact issues, the provision of the lease indicating the presence of the anchor tenant was ambiguous, resort to parol evidence confirms that the anchor tenant's participation was a substantial and material term without which Sportsman's would not have signed the lease, and the failure of that condition justified Sportsman's rescinding the lease. Therefore, Chesterfield's claims for specific performance and damages fail as a matter of law. However, neither Chesterfield nor DDR ever made a misrepresentation of an existing fact, nor did they misrepresent a future promise they had no intention of keeping. Consequently, Sportsman's fraud claims fail as a matter of law as well. Therefore, the Court will deny Chesterfield's motion for summary judgment except to the extent it seeks dismissal of Sportsman's affirmative claims for damages, grant Sportsman's motion for summary judgment insofar as it seeks dismissal of the complaint and deny it in all other respects, and deny as moot the parties several motions *in limine.*

## I.

The undisputed facts that emerge from the discovery materials reveal that Sportsman's, a nationwide "big box" retailer of hunting, fishing, and camping gear, has over sixty stores across the country, some of which are at properties leased from Chesterfield and DDR. In mid–2004, Chesterfield caused DDR to contact Sportsman's and solicit its agreement to lease retail space at a shopping center development in Chesterfield, Michigan. The proposed site was in a new retail plaza known as "Chesterfield Marketplace," which Chesterfield represented would house a Wal–Mart store—later to be expanded into a Super Wal–Mart—and two other "big box" retailers. Sportsman's was to operate its own store, and Chesterfield would construct certain portions of the physical premises. Sportsman's decided to abandon the negotiations following more than a year of negotiations that were complicated by a number of issues.

However, on January 24, 2006, DDR's vice-president, Steven Dorsky, called Sportsman's CEO, Steven Utgaard, and informed him that Sam's Club had agreed to be a tenant. This information apparently rekindled Sportsman's interest in the site. Even though Sam's Club wanted the space that originally had been offered to Sportsman's, Sportsman's accepted DDR's term that it would have to accept a new location in the shopping center and change its building design.

On July 11, 2006, Sportsman's and Chesterfield executed a lease. The lease term was to run for fifteen years, with Sportsman's to retain the option to renew for twenty additional years. The rent was to be based on the square footage of the store, which, as construction had not yet begun, was still to be determined.

Communications leading up to the lease suggest that the prospect of a Sam's Club store anchoring the development was crucial to Sportsman's decision, and lend support to Sportsman's claim that it thought a Sam's Club was going to be built. As mentioned above, Sportsman's Utgaard had a conversation with DDR vice president Dorsky on January 24, 2006. Shortly after that conversation, William Boukalik, DDR's Development Director, sent Mr. Utgaard a follow-up email to which he attached a copy of the then-current site plan. Boukalik wrote:

> Pursuant to your conversation with Steven Dorsky this morning, please see the attached plan. We are in the process of getting the Sam's Club added onto the plan and will send you and [sic] updated plan, as soon as their box is placed on the plan.

Sportsman's Mot. for Summ. J., Ex. P, Boukalik Jan. 24, 2006 e-mail. Dorsky sent a similar email telling Utgaard that DDR was "in the process of updating the plan to show Sam's." Sportsman's Mot. for Summ. J., Ex. Q, Dorsky Jan. 24, 2006 e-mail. According to Utgaard, the Chesterfield project "wouldn't have happened" had Dorsky not "call[ed] and sa[id] that Sam's Club was going to build a store there." Sportsman's Mot. for Summ. J., Ex. E, Utgaard Dep. at 75. It is plain that both parties believed that Sam's Club would be opening a store in the shopping center at the time.

On March 22, 2006, DDR sent the revised site plan as promised. *See* Sportsman's Mot. for Summ. J., Ex. R, Revised Site Plan. The plan depicts a Wal–Mart store next to a Sam's Club on a west-east line, with the Sportsman's Warehouse store situated on a north-south line to the west of Wal–Mart. Originally there was some dispute about Wal–Mart's expansion to a Super Wal–Mart, but that point no longer is in contention in this case. The only thing unusual about the box representing Sam's Club is that the name of the store is prefaced by the word "proposed" in fine-print lettering. The meaning of that term, and whether it creates an ambiguity, frames the principal dispute in his case.

In deposition, DDR's Dorsky explained the importance of site plans:

> We put anchor tenants on our site plans so that our site plans are accurate, showing where we are on the development, what it looks like or what it is going to look like so we can send that to prospective tenants to see what [the] shopping center looks like. We want to show all of our tenants, proposed or actual tenants, on our plans so that tenants can see what the project will look like.

Sportsman's Mot. for Summ. J., Ex. B, Dorsky Dep. at 72–73.

As mentioned above, Sportsman's agreed to move the location of its store to accommodate Sam's Club. This was not simply a matter of placing Sportsman's name on a new box on the site plan; the original plan called for an "end entry" design, whereas the revised version called for a "side entry" design. Utgaard Dep. at 79–80. It took several months to redesign the store, and Sportsman's incurred $22,000 in additional architectural fees. On the other hand, Utgaard stated that the new location was actually superior. *See* Utgaard Dep. at 80 ("[W]e had to move it to the front which was great by me because it was closer to the street, it had better visibility, and everybody that went to Sam's Club or Super Wal–Mart had to drive by our store.").

As the spring of 2006 deepened, the parties continued to negotiate over the precise terms of the lease. Sportsman's signed the lease on June 27, 2006 and Chesterfield followed in kind on July 11, 2006. Nothing in the lease proper suggested that Sam's Club would be a tenant or that Sportsman's would have a right to terminate the lease in the event Sam's Club did not locate there. On the other hand, two exhibits to the lease arguably implied as much. Exhibit B, styled "Depiction of Shopping Center and Premises," was a copy of the site plan described above. The box showing Sam's Club still described it as "proposed." In addition, the legend contained a disclaimer, which is alleged to read:

> This drawing is for general information purposes only. Any and all features, matters and other information depicted hereon or contained herein are for illustrative marketing purposes only, are subject to modification without notice, are not intended to be relied upon by

any party and are not intended to constitute representations or warranties as to the ownership of the real property depicted hereon, the size and the nature of improvements to be constructed (or that any improvements will be constructed) or the identity or nature of any occupants thereof.

Depiction of Shopping Center at 1. However, this disclaimer is not legible, and this Court determined at a previous hearing that it has no legal effect. *See* Order Granting Mot. for Lv. to Amend [dkt # 45]. Exhibit J, styled "Pylon Sign Depiction," was a rendering of the main Chesterfield sign containing individual signs of the anchor tenants. Wal–Mart was followed by Sam's Club and Sportsman's Warehouse. All parties agree that the exhibits are to be included as part of the substantive terms of the lease.

The lease also contained an integration clause, which reads as follows:

This Lease contains all of the agreements made between the parties regarding the subject matter hereof, and may not be modified or amended in any manner, except by an agreement in writing signed by all of the parties hereto, or their respective successors in interest.

Lease at ¶ 34.

Although Sportsman's at this point believed that everything was proceeding apace, DDR's negotiations with Sam's Club were actually sputtering and had been for some time. Early on in the talks, Wal–Mart Corp. insisted that Sam's Club would not move in unless it could also build an adjoining gas station. DDR responded that it would need fueling-station release and indemnity provisions in any agreement they reached. However, the DDR agent spearheading the deal, Tim Bruce, did not consider this a "sticking point" because DDR had consummated similar deals in the past and never had a problem obtaining the necessary terms.

DDR had standard language that it used for gas-station terms. Therefore, when Wal–Mart Corp. sent over a draft purchase agreement without this language, DDR added the terms. Wal–Mart continued to resist. As of May 19, 2006, the issue remained contentious. Mr. Boukalik (of DDR) sent Daniel Hurwitz (of Chesterfield) an e-mail that date, stating as follows:

As you know, prior to the meeting with Wal–Mart on April 17th, Wal–Mart's outside counsel was pushing back on our standard fuel center indemnity language.... Tim Bruce and I addressed this with Mike Gardner at the meeting in April 17th, and at that time, he didn't believe this to be an issue. Since that time, Wal–Mart legal has pushed back and not yielded on the initial position. DDR has even offered to reciprocate the language, should we ever do a fuel center in the shopping center. This continues to be the only issue remaining on the purchase agreement that is preventing us from execution. As a reminder, we have this standard language on every fuel center deal that we do with every tenant in our portfolio, including Wal–Mart.

Sportsman's Mot. for Summ. J., Ex. V, Boukalik May 19, 2006 e-mail.

The volley continued over the next month with little progress. On June 26, 2006, however, Mr. Ewing, Wal–Mart's Senior Real Estate Manager, sent an e-mail containing compromise language. Ewing added, "I don't think we'll be able to get any more than this from our legal department." Sportsman's Mot. for Summ. J., Ex. GG, Ewing Email. DDR refused to accept this "compromise," and instead sent back a draft bearing the same release and indemnity language it had proposed from the beginning. The parties were at a clear deadlock. According to

Mr. Bruce, the language proposed by Wal-Mart was "consistently unacceptable" to DDR and vice-versa. Bruce Dep. at 37. Nevertheless, DDR never stated or even hinted to Sportsman's that the Sam's Club negotiations had reached a roadblock. The Sam's Club deal was pronounced dead on August 2, 2006, about a month after the parties signed the lease in this case.

It was not until March 2007 that Sportsman's learned of the problem. As Sportsman's was about to break ground that month, it discovered that the Wal-Mart had not yet expanded to a Super Wal-Mart, even though it had plans to do so within eight months. Mr. Utgaard called Mr. Dorsky to inquire about the hold-up, and it was then that he learned the Sam's Club deal had fallen through. Utgaard recalled his conversation of March 15, 2007 as follows:

> And then I said to [Dorsky]: When is Sam's Club going to start construction? And he said to me: They're not.
> And I said: Really? I said: That's a problem.
> And he said: Well, we better have our attorneys handle this, and that was our discussion.
> That's the first I knew that Sam's Club was not going to build a store there.

Utgaard Dep. at 100.

The next day, March 16, 2007, Sportsman sent Chesterfield and DDR notice of its intent to terminate the lease. Sportsman's counsel made the reason for termination very clear:

> Please be advised that Sportsman's Warehouse hereby terminates the Lease. Stu Utgaard, Sportsman's CEO, requested that I provide you with this notice of termination by reason of the Landlord's fraudulent inducement to Sportsman's regarding the co-tenancy of Sam's Club in the Shopping Center.
> I am advised that, at the Landlord's specific request, Sportsman's relocated

its premises within the Center prior to the execution of the Lease. Sportsman's agreed to this relocation to accommodate the location for a Sam's Club in the Center. Stu Utgaard advises that but for the Landlord's assurance that Sam's Club would be located in the Center, Sportsman's Warehouse would not have continued its negotiations for the lease of space in the Center.

> Moreover, Stu Utgaard has been made aware that the Landlord knew of Sam's Club's failure to lease within the Center prior to the execution of the Lease. The Landlord's failure to clearly communicate Sam's Club decision to Sportsman's when the Landlord was well advised of Sportsman's desire to be a co-tenant with Sam's Club provides the basis for Sportsman's termination.

Sportsman's Mot. for Summ. J., Ex. KK, Notice of Termination. Utgaard described the impetus for the decision in similar terms: "Chesterfield was terminated for one reason only. Sam's Club was not going there or an equivalent. That's the only reason we went there to start with, okay?" Utgaard Dep. at 250.

Litigation ensued almost immediately, with Chesterfield commencing this action in the Macomb County, Michigan circuit court on April 25, 2007 seeking specific performance of the lease, damages for unpaid rent (now in excess of $600,000), and a declaratory judgment. SW removed the case to this Court on May 24, 2007 and then counterclaimed to rescind the lease and to recover damages for fraud amounting to over $100,000 in costs incurred in redesigning its proposed structure from an "end entry" building to a "side entry" building. Sportsman's added DDR as a third-party defendant.

As mentioned earlier, the major bone of contention is the nature of the representation that Sam's Club was building a store

in the shopping center and whether Sportsman's had a right to rely on it. For their part, Chesterfield and DDR emphasize the lease's silence regarding Sam's Club. However, they also point to evidence to counter the alleged misrepresentations and Sportsman's claim of reasonable reliance. The absence of a co-tenancy provision is significant in light of the fact that, when negotiations began in 2004, Sportsman's had five other leases with DDR and its affiliates, two of which *had* co-tenancy provisions. *See* Utgaard Dep. at 9; Chest. and DDR's Mot. for Summ. J., Ex. 3, Mt. Nebo Lease at ¶ 46 ("If Tenant has not commenced construction of the Building on or before August 1, 2005, as a result of the failure by Target to commence construction of its building on or before August 1, 2005, Tenant shall have the right to terminate this Lease."); Ex. 4, Riverdale Lease at ¶ 5. Furthermore, the letter of intent prefacing negotiations between DDR and Sportsman's expressly stated that there was no co-tenancy provision. *See* Chest. and DDR's Mot. for Summ. J., Ex. 5, Letter of Intent (dated July 13, 2004) at 3 ("Co–Tenancy: None."). Of course, that letter was drafted in 2004, before the original negotiations stalled and well before the possibility of Sam's Club came to light.

Chesterfield and DDR agree that negotiations re-commenced once the possibility of Sam's Club arose. However, they observe that Sportsman's had not entirely abandoned the project beforehand. The evidence shows that, as of January 19, 2006, before Sam's Club became a distinct possibility, Sportsman's was "planning" on submitting its construction plans to the City of Chesterfield.

Moreover, Chesterfield and DDR rely heavily on the fact that there is no evidence that they ever represented Sportsman's would have a right to terminate in the event Sam's Club did not work out. Utgaard testified that Dorsky "didn't say there was a signed lease," and never actually represented that "Sam's bought the property." Utgaard Dep. at 156. *But see ibid.* ("What he said to me is I had to relocate our store because Sam's Club *was* going to build a store where we were.") (emphasis added); *id.* at 155–56 ("Q. Okay. Was it your understanding from your conversations with Mr. Dorsky that Sam's Club had a signed lease ... [?] A. Oh, definitely because he said: You have to move your building because Sam's Club is going here."). Utgaard stated that he could not recall whether anyone from Sportsman's spoke with Chesterfield or DDR about a co-tenancy provision. Utgaard "assume[d]" that counsel Debra Page "had some discussions on that matter," but he was not sure. Utgaard Dep. at 113. But Page testified that this never occurred. *See* Defs.' Mot. for Summ. J., Ex. 7, Page Dep. at 57–58 ("Q. In your negotiations regarding the Chesterfield lease, did you request any language in the lease that would insure the presence of a Sam's Club at or around Chesterfield Marketplace? A. Not to my knowledge.... Q. In your negotiations regarding the Chesterfield lease, did you discuss with anybody representing Chesterfield Exchange any language concerning the presence of a Sam's Club at or around Chesterfield Marketplace? A. I have no recollection of that."). Page further testified that there was nothing in the lease she "would characterize as a co-tenancy provision." *Id.* at 53.

As to the site-plan exhibit showing the "proposed" Sam's Club, Chesterfield and DDR note that Sportsman's was aware of this modifier. Although Mr. Utgaard complained about the legibility of the exhibit, he admitted that he was "aware that the word proposed was there when [he] signed the lease." Utgaard Dep. at 171. To Utgaard, this word meant something like "[p]lanned" or "pending," *id.* at 175, but he

never asked why the word was included, *see id.* at 176.

Whatever hints may have existed beforehand, Chesterfield and DDR submit that the Sam Club's deal was not officially dead until after the lease was signed, and that point is not contradicted by any definitive evidence. The lease was executed on July 11, 2006, but it was not until early August 2006 that Mike Gardner—the Wal-Mart executive in charge of negotiations— informed DDR's Tim Bruce "that the Sam's Club deal [was] dead." Defs.' Mot. for Summ. J., Ex. 14, Bruce e-mail (dated Aug. 2, 2006). Dorsky did not feel the need to pass the word along to Sportsman's, evidently due to the nature of the lease. Dorsky testified to this point as follows:

> Q. . . . I apologize if I've asked this before. After you found out in August 2006 that Sam's wasn't coming in did you give any consideration to telling Sportsman's about that?
>
> . . .
>
> [A.] I didn't really, I didn't really give a lot of thought, I mean, I may have considered it, I don't know, but I didn't really feel the need to go back and inform Stu [Utgaard].
>
> Q. Why didn't you feel the need?
>
> A. You know, we had a lease that was done, we were in the process of obtaining approvals for the design and site plan, there was no cotenancy; I just didn't feel, I felt we should go forward and finish our deal, move forward.

Dorsky Dep. at 134.

With this discovery, the parties filed their cross motions for summary judgment. Each side believes the undisputed facts compel judgment in its favor.

## II.

■ Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute. *Parks v. LaFace Records,* 329 F.3d 437, 444 (6th Cir.2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate."). Instead, the Court must apply the well-recognized standards when deciding such cross motions: when this Court considers cross motions for summary judgment, it "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.,* 336 F.3d 503, 506 (6th Cir.2003).

A motion for summary judgment under Fed.R.Civ.P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

■ Because the Court's authority is this case is based on diversity jurisdiction, Michigan substantive law supplies the rules for decision. In federal cases based upon diversity jurisdiction, the Court must

apply the law of the forum state's highest court. *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). If the state's highest court has not decided an issue, then "the federal court must ascertain the state law from 'all relevant data.'" *Garden City Osteopathic Hosp. v. HBE Corp.,* 55 F.3d 1126, 1130 (6th Cir. 1995) (quoting *Bailey v. V. & O Press Co.,* 770 F.2d 601, 604 (6th Cir.1985)). "Relevant data includes the state's intermediate appellate court decisions, as well as the state supreme court's relevant *dicta,* restatements of the law, law review commentaries, and the majority rule among other states." *Ososki v. St. Paul Surplus Lines,* 156 F.Supp.2d 669, 674 (E.D.Mich.2001) (internal quotes and citation omitted) (quoting *Angelotta v. Am. Broad. Corp.,* 820 F.2d 806, 807 (6th Cir.1987)).

 Chesterfield and DDR premise their case largely on the lease's integration clause and the parol evidence rule, which is not a rule of evidence at all, but rather a tenet of the law of contracts. The parol evidence rule has been summarized as follows: "Parol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous." *Hamade v. Sunoco, Inc. (R & M),* 271 Mich.App. 145, 166, 721 N.W.2d 233, 247 (2006) (internal quotation marks omitted). However, "[a] finding that the parties intended a written instrument to be a complete expression of their agreement concerning the matters covered is a prerequisite" to application of the rule. *Farm Credit Services of Michigan's Heartland, PCA v. Weldon,* 232 Mich.App. 662, 669, 591 N.W.2d 438, 442 (1998). That prerequisite is satisfied by inclusion of an integration or merger clause because such a clause creates a conclusive presumption of the parties' intent to have the contract stand as a complete expression of their agreement. *Hamade,* 271 Mich.App.

at 169, 721 N.W.2d at 248. Even in the face of an integration clause, however, parol evidence is "admissible to demonstrate fraud, which, if proved, would render the contract voidable by the innocent party." *Ibid.*

In this case, the lease documents leave little doubt that the parties intended the writings—including the exhibits to the lease—to be the complete expression of their agreement. The integration or merger clause satisfies that aspect of Michigan contract law.

 But Sportsman's insists that it was the victim of fraud in the inducement to sign the lease, and if not outright fraud, then at least negligent or innocent misrepresentation. It argues that this fraud vitiates the integration clause and allows for consideration of parol evidence to show that it was duped into signing the lease by the promise of a Sam's Club store as a co-tenant. The Court disagrees. To be actionable, fraud normally must relate to a statement concerning a past or existing fact. *Samuel D Begola Services, Inc. v. Wild Bros.,* 210 Mich.App. 636, 639, 534 N.W.2d 217, 219 (1995). Michigan also recognizes promissory fraud in the inducement, which occurs when "a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Ibid.* Fraud in the inducement renders the contract voidable at the election of the defrauded party, *Wild Bros.,* 210 Mich.App. at 640, 534 N.W.2d at 219, and also authorizes damages flowing from reasonable reliance, *see Nowicki v. Podgorski,* 359 Mich. 18, 23–24, 101 N.W.2d 371, 374 (1960); Williston on Contracts § 69:53. Fraud may also occur when a party to a transaction has a duty of disclosure but remains silent. This brand of fraud is known as silent fraud. *See M & D, Inc. v. W.B. McConkey,* 231 Mich.

App. 22, 29, 585 N.W.2d 33, 37 (1998) (" '[T]he suppression of a material fact, which a party in good faith is duty-bound to disclose, is equivalent to a false representation and will support an action in fraud.' ") (quoting *Williams v. Benson*, 3 Mich.App. 9, 19, 141 N.W.2d 650 (1966)). In all cases, "[t]he principal is liable for the acts of an agent when performed in an endeavor to promote the principal's business within the scope of actual or apparent authority conferred upon him for that purpose." *Shinabarger v. Phillips*, 370 Mich. 135, 141, 121 N.W.2d 693, 696 (Mich.1963) (internal quotation marks omitted).

But there is no evidence that Chesterfield or DDR misrepresented a past or present fact in order to induce Sportsman's to sign the lease. Nor did it make a promise that it had no intention of fulfilling in the future. At the time the lease was signed, the undisputed evidence demonstrates that DDR's intention was to include the Sam's Club store in the shopping center. Indeed, all parties to the present lease believed that to be the case.

■ Sportsman's claims that DDR was negligent in its representation that the Sam's Club store would be part of the grouping. But there is no evidence of that, either. The elements of negligent misrepresentation are: (1) justifiable and detrimental reliance on (2) information provided without reasonable care (3) by one who owed a duty of care. *Law Offices of Lawrence J. Stockler v. Rose*, 174 Mich. App. 14, 33, 436 N.W.2d 70 (1989). Although DDR's negotiations with Wal–Mart Corporation had not been concluded, the undisputed evidence plainly shows that DDR believed that a deal was imminent and only the terms of the fueling-station release and indemnity provisions required finalization. Given the past easy dealings between DDR and Wal–Mart Corporation on this very provision, it was not unreasonable for DDR to believe that a deal would

be forthcoming. It is undisputed that the deal for the Sam's Club store did not evaporate until August 2006, about a month *after* the lease was signed. Neither Chesterfield nor DDR engaged in any misrepresentation—fraudulent, negligent, innocent, or otherwise—as a device to induce Sportsman's to sign the lease.

■ But the parol evidence rule also allows for extrinsic evidence to clear up ambiguities. *Goodwin, Inc. v. Orson E. Coe Pontiac, Inc.*, 392 Mich. 195, 220 N.W.2d 664 (1974) (holding that the parol evidence rule does not preclude admitting extrinsic evidence to resolve an ambiguity that is proven to exist and, therefore, to determine the actual intent of the parties); *see also Edoff v. Hecht*, 270 Mich. 689, 695, 260 N.W. 93, 96 (1935) ("The parol evidence rule does not preclude the admission of parol or extrinsic evidence for the purpose of aiding in the interpretation or construction of a written instrument, where the language of the instrument itself taken alone is such that it does not clearly express the intention of the parties or the subject of the agreement.") (internal quotation marks omitted); *Hamade*, 271 Mich.App. at 166, 721 N.W.2d 233; *Meagher v. Wayne State Univ.*, 222 Mich. App. 700, 722, 565 N.W.2d 401, 415 (1997) ("Parol evidence is not admissible to vary a contract that is clear and unambiguous, *In re Skotzke Estate*, 216 Mich.App. 247, 251, 548 N.W.2d 695 (1996), but may be admissible to prove the existence of an ambiguity and to clarify the meaning of an ambiguous contract. *Goodwin, Inc. v. Coe*, 392 Mich. 195, 209, 220 N.W.2d 664 (1974)."); *Hesse v. Superior Business Forms, Inc.*, 2008 WL 441603, *3 (Mich. Ct.App. Feb.19, 2008) ("Plaintiff argues that the parol evidence rule prohibits the admission of extrinsic evidence, even to interpret an ambiguity, if the contract con-

tains an integration clause. We disagree.").

A contract is ambiguous "when its provisions are capable of conflicting interpretations." *AFSCME Int'l Union v. Bank One,* 267 Mich.App. 281, 283–84, 705 N.W.2d 355, 358 (2005) (internal citations and quotation marks omitted). *See also Universal Underwriters Ins. Co. v. Kneeland,* 464 Mich. 491, 496, 628 N.W.2d 491, 494 (2001) (stating that a contract is ambiguous "if its provisions may be reasonably understood in different ways"). Where a term is ambiguous, the court must determine its meaning "in light of the apparent purpose of the contract as a whole, the rules of contract construction, and extrinsic evidence of intent and meaning." *Klapp v. United Ins. Group Agency, Inc.,* 468 Mich. 459, 469, 663 N.W.2d 447, 454 (2003) (internal quotation marks omitted). The proper interpretation of a contract is a question of law. *Coates v. Bastian Brothers, Inc.,* 276 Mich.App. 498, 503, 741 N.W.2d 539, 543 (2007). In engaging in this task, the Court must give the language of the contract its plain and ordinary meaning. *In re Smith Trust,* 480 Mich. 19, 24, 745 N.W.2d 754, 757–58 (2008).

The ambiguity in this case centers on the word "proposed" as a modifier in Exhibit B to the lease entitled "Depiction of Shopping Center and Premises," which is a copy of the site plan showing a Sam's Club store. Chesterfield and DDR contend that the term means "possible" or "likely," but not "promised." They cite *Brady v. Farley,* 193 Md. 255, 257, 66 A.2d 474, 475 (1949), and *Brownsville v. West,* 149 S.W.2d 1034, 1037–38 (Tex.Civ.App. 1941), for that proposition. However, the Michigan Court of Appeals has also construed it to mean "planned" or "intended." *People v. Shahideh,* 277 Mich.App. 111, 116, 743 N.W.2d 233, 237 (2007) (holding that "the word 'propose' is defined as 'to

plan; intend,' *Random House Webster's College Dictionary* (1997), and 'to form or declare a plan or intention,' *Webster's Third New International Dictionary, Unabridged Edition* (1965)"). The word "proposed," therefore, is ambiguous because it can mean anything from "possible" to "intended." *Random House Unabridged Dictionary* (2006). Based on the undisputed evidence in the case, the Court believes that a construction of the term to mean "intended" is required, because the conduct of the parties points ineluctably in that direction. After all, it was the participation of Sam's Club that rekindled the lease negotiations. Because of that, Sportsman's was willing to incur the cost of relocating and redesigning the building to accommodate that inclusion. It is undisputed that DDR's vice-president Dorsky told Sportsman's CEO Utgaard that Sam's Club was going to build a store. DDR and Chesterfield never did anything to inform Sportsman's that Sam's Club would not locate there or that the negotiations had reached an impasse until March 2007. Based on everything Sportsman's knew, it reasonably believed Sam's Club would locate there; Utgaard reasonably thought "proposed" meant "planned" or "pending." Utgaard Dep. at 175. Utgaard testified without contradiction that Sportsman's would not have signed the lease if the Sam's Club store was not part of the shopping center. And the lease as signed included Exhibit B representing the Sam's Club store, which was referenced in the lease and used to describe the physical landscape of the plaza, and Exhibit J, which depicted an entrance sign listing Sam's Club as a tenant. With this interpretation, the Court finds that the lease did in fact contain a representation that Sam's Club would be a tenant.

That does not end the matter, however, because Sportsman's was not jus-

tified in rescinding the lease unless the unfulfilled term is "substantial." "The rule in Michigan is that one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform. However, that rule only applies when the initial breach is substantial." *Michaels v. Amway Corp.*, 206 Mich.App. 644, 650, 522 N.W.2d 703, 706–07 (1994) (internal quotation marks and citations omitted). So while Michigan law holds that a "substantial" or "material" breach of a contract is an adequate basis for rescission, *Walker & Co. v. Harrison*, 347 Mich. 630, 635, 81 N.W.2d 352, 355 (1957); *Philco Corp. v. Flying Tiger Line, Inc.*, 18 Mich.App. 206, 216, 171 N.W.2d 16, 21 (1969), the rescinding party's determination of "substantiality" or "materiality"—the terms are interchangeable—is "fraught with peril," *Walker*, 347 Mich. at 635, 81 N.W.2d at 355. As the Michigan Supreme Court explained, "should such determination, as viewed by a later court in the calm of its contemplation, be unwarranted, the repudiator himself will have been guilty of material breach and himself have become the aggressor, not an innocent victim." *Ibid.*

The Michigan Supreme Court stated that there is "no single touchstone" to separate substantial, rescission-warranting breaches from immaterial ones, but it found the following factors instructive: (1) "[t]he extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated"; (2) "[t]he extent to which the injured party may be adequately compensated in damages for lack of complete performance"; (3) "[t]he extent to which the party failing to perform has already partly performed or made preparations for performance"; (4) "[t]he greater or less hardship on the party failing to perform in terminating the contract"; (5) "[t]he wilful, negligent or innocent behavior of the party failing to perform"; and (6) "[t]he greater or less uncertainty that the party failing to perform will perform the remainder of the contract." *Ibid.* (internal quotation marks omitted).

In application, the jurisprudence defining "substantiality" is not without some degree of conflict. For instance, in *Baith v. Knapp–Stiles, Inc.*, 380 Mich. 119, 126, 156 N.W.2d 575, 579 (1968), the court stated that substantiality "can be found only in cases where the breach has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered *ineffective* or *impossible*, such as the causing of a *complete* failure of consideration or the *prevention of further performance* by the other party." (emphasis added) (internal quotation marks and citation omitted). In contrast, another judge of this Court explained: "Where the breach substantially limits the non-breaching party from receiving the benefit of his bargain, the breach is deemed material and the victim of the breach may rescind the deal." *P.A.L. Investment Group, Inc. v. Staff-Builders, Inc.*, 118 F.Supp.2d 781, 787 (E.D.Mich.2000) (applying Michigan law). The latter understanding is supported by the greater weight of recent cases, as well as the national approach. *See Adell Broadcasting v. Apex Media Sales*, 269 Mich.App. 6, 13–14, 708 N.W.2d 778, 783 (2005) (stating that "rescission is permissible when there is failure to perform a substantial part of the contract or one of its essential items, or where the contract would not have been made if default in that particular had been expected or contemplated") (internal quotation marks omitted); *Omnicom of Michigan v. Giannetti Inv.*, 221 Mich.App. 341, 348, 561 N.W.2d 138, 141 (1997) ("In determining whether a breach is material, the court should consider whether the nonbreaching party obtained the benefit it reasonably

expected to receive."); *Holtzlander v. Brownell*, 182 Mich.App. 716, 721–22, 453 N.W.2d 295, 298 (1990) ("In order to warrant recision, there must be a material breach affecting a substantial or essential part of the contract. One consideration in determining whether a breach is material is whether the nonbreaching party obtained the benefit which he or she reasonably expected to receive."); Corpus Juris Secundum Contracts § 468 (explaining that "the breach must go to the root, heart, or essence of the contract, and as long as such is the case, even a partial failure of performance may merit rescission") (footnotes omitted).

In this case, there is no doubt that a major consideration propelling Sportsman's to commit to space in the plaintiff's shopping center was the presence of a big box anchor tenant. In fact, all the evidence suggests that the promise of a pending Sam's Club was material to Sportsman's decision to sign the lease. Therefore, when it was clear that the Sam's Club was not going to be built, Sportsman's had the option to rescind the lease.

### III.

Because there was a failure of a material term of the lease on the part of Chesterfield, Sportsman's had a right to rescind the lease and no obligation to perform. Chesterfield, in turn, may not enforce the lease or recover damages because of the failure of that material term. Neither Chesterfield nor DDR engaged in any fraudulent conduct or other misrepresentation, so Sportsman's cannot prevail on its affirmative claim for damages.

Accordingly, it is **ORDERED** that the motion for summary judgment by Chesterfield Exchange, LLC and Developers Diversified Realty Corporation [dkt # 50] is **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that the motion for summary judgment by Sportsman's Warehouse, Inc. [dkt # 47] is **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE.**

It is further **ORDERED** that the defendant may have judgment on the counterclaim only insofar as it seeks recision of the lease, and in all other respects the counterclaim and third-party complaint are **DISMISSED WITH PREJUDICE.**

It is further **ORDERED** that the plaintiff's motion to exclude expert testimony [dkt # 80] and the defendant's motions *in limine* [dkt # s 98, 99, 100, 101, 102, 103, 104, 105, 106] are **DISMISSED as moot.**